PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-4652

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

MOHAMMAD SAAILI SHIBIN, a/k/a Khalif Ahmed Shibin, a/k/a Mohammad Ali, a/k/a Ali Jama,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk.  Robert G. Doumar, Senior District Judge.  (2:11-cr-00033-RGD-DEM-1)

Argued: May 14, 2013                    Decided: July 12, 2013

Before NIEMEYER, MOTZ, and FLOYD, Circuit Judges.

Affirmed by published opinion.  Judge Niemeyer wrote the opinion, in which Judge Motz and Judge Floyd joined.

**ARGUED:** James Orlando Broccoletti, ZOBY & BROCCOLETTI, P.C., Norfolk, Virginia, for Appellant.  Benjamin L. Hatch, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee.  **ON BRIEF:** Neil H. MacBride, United States Attorney, Alexandria, Virginia; Joseph E. DePadilla, Brian J. Samuels, Assistant United States Attorneys, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee.

NIEMEYER, Circuit Judge:

On May 8, 2010, Somali pirates seized the German merchant ship the Marida Marguerite on the high seas, took hostages, pillaged the ship, looted and tortured its crew, and extorted a $5-million ransom from its owners. Mohammad Saaili Shibin, while not among the pirates who attacked the ship, boarded it after it was taken into Somali waters and conducted the negotiations for the ransom and participated in the torture of the merchant ship's crew as part of the process.

On February 18, 2011, Somali pirates seized the American sailing ship the Quest on the high seas. A U.S. Navy ship communicated with the pirates on board in an effort to negotiate the rescue of the ship and its crew of four Americans, but the pirates referred the Navy personnel to Shibin as their negotiator. When the Navy ship thereafter sought to bar the pirates from taking the Quest into Somali waters, the pirates killed the four Americans.

Shibin was later located and arrested in Somalia and turned over to the FBI, which flew him to Virginia to stand trial for his participation in the two piracies. A jury convicted him on 15 counts, and he was sentenced to multiple terms of life imprisonment.

On appeal, Shibin contends that the district court erred by refusing (1) to dismiss the piracy charges on the ground that

2

Shibin himself did not act on the high seas and therefore the court lacked subject-matter jurisdiction over those charges; (2) to dismiss all counts for lack of personal jurisdiction because Shibin was forcibly seized in Somalia and involuntarily removed to the United States; (3) to dismiss the non-piracy counts involving the Marida Marguerite because "universal jurisdiction" did not extend to justify the U.S. government's prosecution of those crimes; and (4) to exclude FBI Agent Kevin Coughlin's testimony about prior statements made to him by a Somali-speaking witness through an interpreter because the interpreter was not present in court.

We conclude that the district court did not err in refusing to dismiss the various counts of the indictment and did not abuse its discretion in admitting Agent Coughlin's testimony. Accordingly, we affirm.

I

The Piracy of the Marida Marguerite

As the Marida Marguerite was making way in the Indian Ocean on a trip from India to Antwerp and preparing to join a protected convoy to transit the Gulf of Aden, she was attacked by Somali pirates in a small, high-speed boat. The Marida Marguerite was manned by a crew of 22 from Bangladesh, India, and Ukraine, and was carrying a shipment of benzene and castor oil. As the Marida Marguerite attempted evasive maneuvers, the

3

pirates fired two rocket-propelled grenades at the ship, prompting the ship's captain to surrender. After taking control of the ship in international waters, the pirates, armed with AK-47s, forced the crew to head for Somali waters. While in route, they looted the ship, including the personal valuables of crew members.

The Marida Marguerite arrived first at an anchorage near Hafun on the east coast of Somalia, where "a multitude" of other hijacked ships were anchored. At that location, additional pirates boarded the ship with more weapons, including assault weapons, rocket-propelled grenades, and two large stationary machine guns. The ship was then moved to an anchorage off Garaad, a town controlled by pirates, where Shibin boarded the ship. It was ultimately moved to Hobyo, on the southeast coast of Somalia. Shibin remained on board for over 7 months (except for a vacation of 10 to 12 days during the summer) until the ransom was received.

During the period that the ship was held captive, Shibin, who had a high position among the pirates, served principally as the negotiator, using tactics that included the psychological and physical torture of the crew. Ultimately, Shibin was able to extort a $5-million ransom from the ship's owners, and the money was air-dropped at the ship. After the money was confirmed, the pirates released the ship to a waiting U.S.

4

frigate, which escorted it to safety.  Shibin was among the last of the pirates to disembark.

For a period during the seizure of the Marida Marguerite and its crew, Shibin was deposed as the negotiator, and an "investor" took over.  For that period, Shibin was demoted to the role of a "regular" or "normal" pirate and carried an AK-47 as he stood guard over the hostages.  After a short period of time, however, Shibin was reappointed as the negotiator, and he completed the deal for the $5-million ransom in December 2010.

The Piracy of the Quest

Several months later, on February 18, 2011, as a U.S. sailing vessel, the Quest, was making way from India to Oman as part of an international yacht rally, a group of Somali pirates hijacked the ship.  The ship was manned by four Americans -- its owners Scott and Jean Adams, and their friends Phyllis Macay and Robert Riggle.  The pirates, carrying automatic weapons and a rocket-propelled grenade launcher, boarded the Quest in the Arabian Sea, roughly 400 miles from Oman and 900 miles from Somalia.  The pirates planned to take the ship back to Somalia, where their colleague Shibin would negotiate a ransom.

The U.S. Navy learned of the Quest's seizure, and several Navy ships began shadowing it.  After Navy personnel were able to establish bridge-to-bridge radio communications with the

pirates, the pirates told the Navy that they lacked the authority to negotiate and that their job was to capture vessels and hostages and return them to Somalia where their English-speaking negotiator would arrange a ransom. As the pirates and the Quest continued towards Somali territorial waters, the Navy asked the pirates for the name and contact information of their negotiator. The pirates told the Navy that the person to contact was Shibin, and they provided the Navy with Shibin's cell phone number. The Navy did not, however, then attempt to call him, for strategic reasons.

By the morning of February 22, 2011, as the Quest was nearing Somali waters, Navy personnel advised the pirates that they had to stop. When the pirates did not comply, the Navy attempted to position one of its ships to block the pirates, prompting the pirates to fire a rocket-propelled grenade at the Navy. As the Navy continued to close in, but before it reached the Quest, the pirates shot and killed all four Americans on board.

Shibin's Capture

Following the attack on the Quest, FBI agents worked to collect evidence of Shibin's involvement in the Quest piracy. During the investigation, they learned from German law enforcement authorities about Shibin's possible involvement in

6

the hijacking of the Marida Marguerite.  They also learned from a pirate and from piracy investors that Shibin had planned to invest his share of the Marida Marguerite ransom in the Quest piracy.  Such an investment would entitle him to a return as a portion of the eventual ransom.

On April 4, 2011, "Host Nation Defense Forces" in Somalia, acting in cooperation with the FBI, arrested Shibin in the northern city of Bosasso, in the Puntland region of Somalia. Earlier, they had recovered his cell phone and had turned it over temporarily to the FBI.  Within a few hours of Shibin's arrest, two FBI agents arrived in Bosasso to question Shibin while he was still in the Defense Forces' custody.  They questioned Shibin three times over the course of three days. Shibin stated that he had used a cell phone with a SIM number matching the phone number that the pirates had given the Navy, but he claimed to have lost the phone several weeks before in a taxi in Zambia. Shibin told the agents that he had operated as the negotiator at one time during the Marida Marguerite piracy, for which he had received $30,000.  He denied any involvement in the hijacking of the Quest, but admitted to conducting internet searches on his phone regarding the Quest and its crew simply as a matter of curiosity.  He pointed out that he had an "auto-alert" feature on his phone that sent him messages about hijackings in and around Somali waters.

7

With Shibin's permission, the FBI agents searched his luggage, obtaining bank records and other items relevant to the piracies. The bank records showed that Shibin had deposited $37,000 on January 6, 2011, shortly after the payment of the Marida Marguerite ransom, and that he had withdrawn $19,952 between January 10 and March 1, 2011.

The cell phone, which Host Nation Defense Forces temporarily turned over to the FBI for its investigation, had the same SIM number that had been provided to the Navy by the pirates on the Quest. Shibin's "contacts" list contained entries for several of the investors in the Quest piracy. The cell phone revealed that during the time when the Quest was in the pirates' custody, one of the Quest investors had texted Shibin, asking him to call. Shibin's cell phone was also in frequent contact with various other investors, using both cell phone calls and text messages. On the day that the pirates seized the Quest, Shibin received a text message stating, "Sarindaaq captured Americans." Sarindaaq was the leader of the pirates who had physically seized the Quest. The cell phone indicated that over the next several days, from February 19 to 21, Shibin conducted internet searches on topics like "Hijacked S/V Quest value," "Jean and Scott Adams profile," "address of hijacked S/V Quest owner," and "Jean and Scott Adams telephone number."

8

On April 6, 2011, the Host Nation Defense Forces transferred custody of Shibin to the Bosasso Police Department, and the Bosasso Police in turn transferred custody of Shibin to the FBI. The FBI placed Shibin under arrest for charges related to the Quest piracy and transported him to the Oceana Naval Air Station in Virginia Beach, Virginia.

Prosecution

Shibin was initially charged in a three-count indictment for his alleged role in the piracy of the Quest. A later superseding indictment, returned on August 17, 2011, added charges relating to the piracy of the Marida Marguerite, as well as additional charges relating to the piracy of the Quest. Counts 1 through 6, arising from the piracy of the Marida Marguerite, charged the following crimes:

1. Piracy under the law of nations, in violation of 18 U.S.C. §§ 1651 and 2;

2. Conspiracy to commit hostage taking, in violation of 18 U.S.C. § 1203(a);

3. Hostage taking, in violation of 18 U.S.C. §§ 1203(a) and 2;

4. Conspiracy to commit violence against maritime navigation, in violation of 18 U.S.C. § 2280(a)(1)(H);

5. Violence against maritime navigation, in violation of 18 U.S.C. §§ 2280(a)(1)(A) and 2; and

6. Use of a firearm during a crime of violence, in violation of 18 U.S.C. §§ 924(c) and 2.

Counts 7 through 15, arising from the piracy of the Quest, charged the following crimes:

7. Piracy under the law of nations, in violation of 18 U.S.C. §§ 1651 and 2;

8. Conspiracy to commit hostage taking, in violation of 18 U.S.C. § 1203(a);

9. Hostage taking, in violation of 18 U.S.C. §§ 1203(a) and 2;

10. Conspiracy to commit kidnapping, in violation of 18 U.S.C. § 1201(c);

11. Kidnapping, in violation of 18 U.S.C. §§ 1201(a)(2) and 2;

12. Conspiracy to commit violence against maritime navigation, in violation of 18 U.S.C. § 2280(a)(1)(H);

13. Violence against maritime navigation, in violation of 18 U.S.C. §§ 2280(a)(1)(A) and 2;

14. Use of a firearm during a crime of violence, in violation of 18 U.S.C. §§ 924(c) and 2; and

15. Use of a firearm during a crime of violence, in violation of 18 U.S.C. §§ 924(c) and 2.

Shibin filed multiple pretrial motions, including a motion to dismiss the piracy charges in Counts 1 and 7, because the government did not allege that Shibin himself acted on the high seas, and a motion to dismiss all charges for lack of jurisdiction. The district court deferred ruling on the motion to dismiss the piracy charges until hearing evidence at trial and denied the other motions. Shibin renewed all motions to

10

dismiss at the close of the government's case and again prior to sentencing, all of which the court denied.

During the course of the trial, which lasted ten days, Shibin called one witness, pirate and family member Mohamud Salad Ali, who was one of the leaders of the Quest piracy. While Salad Ali testified that he never personally asked for or formed an agreement with Shibin to be the negotiator for the Quest, he acknowledged, on cross examination, that the Quest investors could have selected Shibin as the negotiator without his knowledge. Salad Ali denied having told the FBI during earlier interviews that he had spoken with Shibin before going to sea and had told Shibin that he would call when he had "prey," meaning a captured vessel; that he had told Shibin that he was going to sea to hijack a ship and that Shibin had replied that he was ready to be their translator; and that he had told Shibin that Shibin would be the negotiator.

In rebuttal, the government called FBI Agent Kevin Coughlin, who had participated in the earlier interviews with Salad Ali and had recorded what he had said. Agent Coughlin testified, over Shibin's objection, that Salad Ali had in fact made the statements he denied. Shibin objected because Coughlin reported what an interpreter said, not Salad Ali, and the interpreter was not present to be cross examined. Agent Coughlin explained that he used an FBI Somali linguist to

11

translate both his questions and Salad Ali's answers and that Salad Ali did not appear to have any trouble understanding the questions.

The jury convicted Shibin on all counts, and the district court sentenced him to 12 terms of life imprisonment, two of which were to be served consecutively; a consecutive 120-month term of imprisonment; and several concurrent 240-month terms.

This appeal followed.

II

Shibin contends first that he did not "commit the crime of piracy," as charged in Counts 1 and 7, because, "according to statutory text, legislative history, and international law, [he] could only be convicted of aiding and abetting piracy if the government proved that he was on the high seas, and while on the high seas, facilitated piratical acts."

The government observes that there is no dispute that the piracies in this case occurred on the high seas beyond the territorial waters of Somalia, which are generally defined as the waters within 12 nautical miles of the coast. It contends that Shibin is liable as a principal in those piracies, even though he did not personally venture into international waters, because he "intentionally facilitated" and thereby aided and abetted the piracies. The government argues that liability for

12

aiding and abetting piracy is not limited to conduct on the high

seas, explaining:

> That no such limitation is imposed is sensible. Once
> members of a joint criminal enterprise trigger the
> universal jurisdiction that applies to piracy on the
> high seas, both international and domestic law
> prudently include in the scope of the crime all those
> persons that worked together to commit it, including
> those leaders like Shibin who facilitate the crime and
> without which the crime itself would not be possible.

In Counts 1 and 7, Shibin was charged with committing and

aiding and abetting the crime of piracy, in violation of 18

U.S.C. §§ 1651 and 2. Section 1651 provides:

> Whoever, on the high seas, commits the crime of piracy
> as defined by the law of nations, and is afterwards
> brought into or found in the United States, shall be
> imprisoned for life.

18 U.S.C. § 1651. And § 2 provides:

> Whoever commits an offense against the United States
> or aids, abets, counsels, commands, induces or
> procures its commission, is punishable as a principal.

18 U.S.C. § 2(a).

The district court's jurisdiction over these crimes arises

from "universal jurisdiction." Universal jurisdiction is an

international law doctrine that recognizes a "narrow and unique

exception" to the general requirement that nations have a

jurisdictional nexus before punishing extraterritorial conduct

committed by non-nationals. United States v. Hasan, 747 F.

Supp. 2d 599, 608 (E.D. Va. 2010), aff'd sub nom. United States

v. Dire, 680 F.3d 446 (4th Cir. 2012). It allows any nation

13

"jurisdiction to define and prescribe punishment for certain offenses recognized by the community of nations as a universal concern." Restatement (Third) of Foreign Relations Law § 404 (1987). Universal jurisdiction requires "not only substantive agreement as to certain universally condemned behavior but also procedural agreement that universal jurisdiction exists to prosecute a subset of that behavior." Sosa v. Alvarez-Machain, 542 U.S. 692, 762 (2004) (Breyer, J., concurring in part and concurring in the judgment). The parties agree that piracy is subject to universal jurisdiction, as pirates are considered hostis humani generis, the enemies of all humankind. See Harmony v. United States, 43 U.S. (2 How.) 210, 232 (1844).

The issue presented by this appeal is whether Shibin, whose conduct took place in Somalia and in Somalia's territorial waters, may be prosecuted as an aider and abettor of the piracies of the Marida Marguerite and the Quest, which took place on the high seas. Shibin agrees that if his conduct had indeed taken place on the high seas, he could have been found guilty of aiding and abetting piracy. But in this case he participated in the piracies by conduct which took place only in Somalia and on the Marida Marguerite while it was located in Somali territorial waters. The issue thus reduces to a question of whether the conduct of aiding and abetting § 1651 piracy must itself take place on the high seas.

14

Section 1651 punishes piracy as that crime is defined by the law of nations <u>at the time of the piracy</u>. <u>See</u> <u>Dire</u>, 680 F.3d at 469 (noting that "§ 1651 incorporates a definition of piracy that changes with advancements in the law of nations"). In <u>Dire</u>, we held that Article 101 of the United Nations Convention on the Law of the Sea ("UNCLOS") accurately articulates the modern international law definition of piracy. <u>Id.</u> at 459, 469.[*]

Article 101 of UNCLOS provides:

Piracy consists of any of the following acts:

(a) any illegal <u>acts</u> of violence or detention, or any act of depredation, committed for private ends by the crew or the passengers of a private ship or a private aircraft, and <u>directed</u>:

  (i) <u>on the high seas, against another ship</u> or aircraft, <u>or against persons or property on board such ship</u> or aircraft;

  (ii) against a ship, aircraft, persons or property in a place outside the jurisdiction of any State;

(b) any act of voluntary participation in the operation of a ship or of an aircraft with knowledge of facts making it a pirate ship or aircraft;

---

[*] Although over 160 nations are parties to UNCLOS, making up an "overwhelming majority of the world," the United States has not signed or ratified the Convention because "of its disagreement with the deep seabed regime setout in Part XI of the Convention." <u>Hasan</u>, 747 F. Supp. 2d at 619 (citing 1 Thomas J. Schoenbaum, <u>Admiralty and Maritime Law</u> § 2-2 (4th ed. 2004)).

15

>     (c) any <u>act</u> of inciting or <u>of intentionally
>     facilitating an act described in subparagraph (a)
>     or (b).</u>

UNCLOS art. 101, Dec. 10, 1982, 1833 U.N.T.S. 397, 436 (emphasis added).  Thus, as relevant here, Article 101(a) defines piracy to include specified acts "directed on the high seas against another ship . . . or against persons or property on board such ship," and Article 101(c) defines piracy to include any act that "intentionally facilitat[es]" any act described in Article 101(a).  The parties agree that the facilitating conduct of Article 101(c) is "functionally equivalent" to aiding and abetting criminal conduct, as proscribed in 18 U.S.C. § 2.

While Shibin's conduct unquestionably amounted to acts that intentionally facilitated Article 101(a) piracies on the high seas, he claims that in order for his facilitating conduct to amount to piracy, his conduct must also have been carried out on the high seas.  The text, however, hardly provides support for this argument.  To the contrary, the better reading suggests that Articles 101(a) and 101(c) address distinct acts that are defined in their respective sections.

Article 101(a), which covers piracies on the high seas, explicitly requires that the specified acts be directed <u>at ships on the high seas</u>.  But Article 101(c), which defines different piratical acts, independent of the acts described in Article 101(a), is linked to Article 101(a) only to the extent that the

16

acts must <u>facilitate</u> Article 101(a) acts. Article 101(c) does not limit the facilitating acts to conduct on the high seas. Moreover, there is no conceptual reason why acts facilitating high-seas acts must themselves be carried out on the high seas. The text of Article 101 describes one class of acts involving violence, detention, and depredation of ships on the high seas and another class of acts that facilitate those acts. In this way, Article 101 reaches all the piratical conduct, wherever carried out, so long as the acts specified in Article 101(a) are carried out on the high seas.

We thus hold that conduct violating Article 101(c) does not have to be carried out on the high seas, but it must incite or intentionally facilitate acts committed against ships, persons, and property on the high seas. <u>See also</u> <u>United States v. Ali</u>, __ F.3d __, No. 12-3056, slip op. at 12, 20 (D.C. Cir. June 11, 2013) (similarly interpreting Article 101(c) in the course of holding that the liability of an aider and abettor of a § 1651 piracy "is not contingent on his having facilitated these acts while in international waters himself").

Citing UNCLOS Article 86, Shibin argues that we should read a "high-seas" requirement into the definition of the facilitating acts described in Article 101(c). Article 86 provides: "The provisions of this Part [Part VII, "High Seas," which includes Article 101] apply to all parts of the sea that

17

are not included in the exclusive economic zone, in the territorial sea or in the internal waters of a State, or in the archipelagic waters of an archipelagic State." UNCLOS art. 86, 1833 U.N.T.S. at 432.

Our reading of Article 101, however, is not inconsistent with Article 86, as Article 101(a) does indeed identify piratical acts as acts against ships on the high seas. The subordinated acts of Article 101(c) are also acts of piracy because they facilitate Article 101(a) acts. Moreover, Article 86 serves only as a general introduction, providing context to the provisions that follow. It does not purport to limit the more specific structure and texts contained in Article 101. See RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 132 S. Ct. 2065, 2070 (2012) ("[I]t is a commonplace of statutory construction that the specific governs the general" (alteration in original) (quoting Morales v. Trans World Airlines, Inc., 504 U.S. 374, 384 (1992))).

Additionally, Shibin's argument is inconsistent with the interpretation of Article 101 given by various international authorities, including the United Nations Security Council. Cf. Dire, 680 F.3d at 469 (looking to a United Nations Security Council resolution to discern that UNCLOS represents "the definition of piracy under the law of nations"). In 2011, the Security Council adopted Resolution 1976, which reaffirmed that

18

"international law, as reflected in . . . [UNCLOS], in particular its articles 100, 101 and 105, sets out the legal framework applicable to combating piracy and armed robbery at sea." S.C. Res. 1976, preambular ¶ 8, U.N. Doc. S/RES/1976 (Apr. 11, 2011). Importantly, the Resolution stressed "the need to investigate and prosecute those who illicitly finance, plan, organize, or unlawfully profit from pirate attacks off the coast of Somalia, recognizing that individuals and entities who incite or intentionally facilitate an act of piracy are themselves engaging in piracy as defined under international law." Id. ¶ 15 (emphasis added). Clearly, those who "finance, plan, organize, or unlawfully profit" from piracy do not do so on the high seas.

Similarly, Security Counsel Resolution 2020, adopted in 2011, recognizes "the need to investigate and prosecute not only suspects captured at sea, but also anyone who incites or intentionally facilitates piracy operations, including key figures of criminal networks involved in piracy who illicitly plan, organize, facilitate, or finance and profit from such attacks." S.C. Res. 2020, preambular ¶ 5, U.N. Doc. S/RES/2020 (Nov. 22, 2011) (emphasis added).

These sources reflect, without ambiguity, the international viewpoint that piracy committed on the high seas is an act against all nations and all humankind and that persons

19

committing those acts on the high seas, as well as those supporting those acts from anywhere, may be prosecuted by any nation under international law. See Ali, __ F.3d at __, No. 12-3056, slip op. at 20.

Shibin makes a similar argument that he made with respect to UNCLOS to the domestic law provisions of 18 U.S.C. §§ 1651 and 2. Thus, he argues that the "on the high seas" requirement contained in § 1651 means that even those who are charged under § 2 for aiding and abetting a § 1651 piracy must act on the high seas. As he did with Article 101, Shibin seeks to import the high seas locational component of § 1651 into § 2. We believe that this argument fairs no better.

To violate § 1651, a principal must carry out an act of piracy, as defined by the law of nations, on the high seas. But Shibin was not prosecuted as a principal; he was prosecuted as an aider and abettor under § 2. Section 2 does not include any locational limitation, just as Article 101(c) of UNCLOS does not contain a locational limitation. Section 2 more broadly punishes conduct that "aids, abets, counsels, commands, induces or procures" commission of "an offense against the United States," including conduct punished in § 1651. 18 U.S.C. § 2(a). And nothing in § 1651 suggests that an aider and abettor must satisfy its locational requirement.

20

It is common in aiding-and-abetting cases for the facilitator to be geographically away from the scene of the crime. For example, to be convicted of aiding and abetting a bank robbery, one need not be inside the bank. See United States v. Ellis, 121 F.3d 908, 924 (4th Cir. 1997) ("[O]ne's physical location at the time of the robbery does not preclude the propriety of an aiding and abetting charge"); United States v. McCaskill, 676 F.2d 995, 1000 (4th Cir. 1982) (concluding that driver of the getaway car was liable as an aider-and-abettor); Tarkington v. United States, 194 F.2d 63, 68 (4th Cir. 1952) ("It is also obvious that there is no merit in the contention that the conviction was invalidated because [the defendant] was not physically present at the bank when the robbery took place"). Similarly, "[o]ne need not be present physically at the time to be guilty as an aider and abettor in an embezzlement." United States v. Ray, 688 F.2d 250, 252 (4th Cir. 1982).

Nonetheless, Shibin relies on United States v. Ali, 885 F. Supp. 2d 17 (D.D.C. 2012), rev'd in relevant part, __ F.3d at __, No. 12-3056, slip op. at 32, to contend that we should read a locational limitation into § 2 based on the Supreme Court's interpretation of the predecessor statute. In United States v. Palmer, 16 U.S. (3 Wheat.) 610, 633-34 (1818), the Supreme Court concluded that the piracy provisions of the Crimes Act of 1790

21

did not reach conduct committed by foreign vessels traversing the high seas. To reverse that ruling, Congress revised the offense of general piracy. But in doing so, it did not alter § 10 of the Crimes Act of 1790, which is § 2's predecessor. From this history, Shibin argues that § 2 is therefore a municipal statute, applying only to piracy within United States territory. But the tie between Palmer and § 2 is not strong enough to validate Shibin's argument. First, the Supreme Court's comments in Palmer on § 2's predecessor are dicta. See Palmer, 16 U.S. at 629-30. But more importantly, § 2's predecessor was tied to the crimes proscribed by the Crimes Act of 1790 and was narrower than today's § 2. Thus, Palmer did not construe the modern aiding-and-abetting liability. We are satisfied to give § 2, in its present form, its natural reading.

Accordingly, we affirm Shibin's piracy convictions in Counts 1 and 7, based on his intentionally facilitating two piracies on the high seas, even though his facilitating conduct took place in Somalia and its territorial waters.

III

Shibin next contends that the indictment should have been dismissed for lack of personal jurisdiction because he was "forcibly seized and removed from [Somalia] by agents of the United States government and was provided no opportunity to

22

challenge either his detention or his removal." He argues that the lack of an extradition treaty between Somalia and the United States

> should not be construed to mean one nation's acquiescence to another government's exercise of power over its citizens. The lack of a treaty with Somalia is not permission given by the Somalia government to the United States to enter its country and seize its citizens for arrest, transport, and prosecution.

> \*　　\*　　\*

> Because the lack of a treaty is not permission or silent acquiescence to foreign governmental seizure of their citizens, the United States must respect Somalia's decision not to enter into an extradition treaty with us and go through official Somali channels to obtain custody of Mr. Shibin -- if Somalia would allow it.

Shibin was initially detained in Bosasso, Somalia, by Host Nation Defense Forces. A few days later, these forces turned him over to the Bosasso Police Department, and the Bosasso Police in turn handed him over to the FBI, which took him to Virginia, where he was "found" for U.S. jurisdictional purposes.

Under the Ker-Frisbie doctrine, the manner in which the defendant is captured and brought to court is generally irrelevant to the court's personal jurisdiction over him. See Ker v. Illinois, 119 U.S. 436, 444 (1886) ("[S]uch forcible abduction is no sufficient reason why the party should not answer when brought within the jurisdiction of the court which has the right to try him for such an offense, and presents no

23

valid objection to his trial in such court"); Frisbie v. Collins, 342 U.S. 519, 522 (1952) ("There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will"); see also Kasi v. Angelone, 300 F.3d 487, 493-95 (4th Cir. 2002).

Shibin argues that the Ker-Frisbie doctrine does not apply to him because Somalia and the United States do not have an extradition treaty. He suggests that the absence of a treaty should be taken as Somalia's wish not to have persons extradited and therefore removed involuntarily. But Shibin cites no case law for this theory, and we could find none. Indeed, the existence of an extradition treaty is hardly relevant to the applicability of the doctrine, unless the terms of the treaty explicitly foreclose it.

To be sure, there are fleeting references in the case law to exceptions to the Ker-Frisbie doctrine. For instance, in United States v. Alvarez-Machain, 504 U.S. 655, 662-70 (1992), the Court analyzed whether a treaty between countries, under which a breach would limit the jurisdiction of a court, prohibited the defendant's abduction. The implication there was that if the treaty so provided, the United States would be bound by the treaty. But the implication was not that the absence of a treaty would limit a court's jurisdiction.

24

More explicitly, in <u>United States v. Anderson</u>, 472 F.3d 662, 666 (9th Cir. 2006), the court stated that the <u>Ker-Frisbie</u> doctrine does have exceptions that would deprive the court of jurisdiction over an extradited defendant when "(1) the transfer of the defendant violated the applicable extradition treaty, or (2) the United States government engaged in misconduct of the most shocking and outrageous kind to obtain his presence." (Internal quotation marks and citations omitted). Another court observed, however, that the shock-the-conscience exception rests on "shaky ground." <u>United States v. Best</u>, 304 F.3d 308, 312-13 (3d Cir. 2002).

Nonetheless, neither of the exceptions suggested in <u>Anderson</u> would help Shibin in this case. First, Shibin cites no treaty between Somalia and the United States that could limit a federal court's jurisdiction over him. And second, Shibin has failed to show that the government's conduct in this case was, in any degree, "of the most shocking and outrageous kind." <u>Anderson</u>, 472 F.3d at 666 (internal quotation marks omitted).

Factual realities also undermine Shibin's arguments. Although Shibin claims that he should have been allowed some formal process in Somalia, he does not identify what this process might have been. He has identified no extradition treaty or extradition process, and he has pointed to no other established legal process that might have been applicable.

25

At bottom, we conclude that Shibin's presence in the United States, although against his will, satisfied the personal jurisdiction requirements of "brought into" or "found in," as contained in 18 U.S.C. §§ 1651, 1203, and 2280. See, e.g., United States v. Shi, 525 F.3d 709, 725 (9th Cir. 2008) (concluding that "the [statutory] requirement that a defendant be 'later found' does not contain the implicit requirement that the defendant's arrival in the United States be voluntary"); United States v. Rezaq, 134 F.3d 1121, 1130 (D.C. Cir. 1998) (holding that "found in" does not create a statutory exception to the Ker-Frisbie rule); United States v. Yunis, 924 F.2d 1086, 1092 (D.C. Cir. 1991) (finding that the statutory term "found in" "does not indicate the voluntariness limitation urged by [the defendant]"). Accordingly, we affirm the district court's ruling denying Shibin's motion to dismiss the indictment for lack of personal jurisdiction based on his being brought into the United States involuntarily.

IV

Shibin next contends that the non-piracy counts related to the Marida Marguerite, Counts 2 through 6, must be dismissed because "the universal jurisdiction doctrine did not provide the [district] court with jurisdiction" over those counts. Counts 2 through 6 charge Shibin with the following offenses:

26

> Count 2: Conspiracy to commit hostage taking, in violation of 18 U.S.C. § 1203(a);
>
> Count 3: Hostage taking, in violation of 18 U.S.C. §§ 1203(a) and 2;
>
> Count 4: Conspiracy to commit violence against maritime navigation, in violation of 18 U.S.C. §§ 2280(a)(1)(H);
>
> Count 5: Violence against maritime navigation, in violation of 18 U.S.C. §§ 2280(a)(1)(A) and 2; and
>
> Count 6: Use of a firearm during a crime of violence, in violation of 18 U.S.C. §§ 924(c) and 2.

Shibin argues that these crimes do not fit within the small set of crimes that are universally cognizable and therefore subject to prosecution under universal jurisdiction.

The government contends that universal jurisdiction was not invoked for the prosecution of Counts 2 through 6. Rather, "the criminal statutes [themselves] are clear in the extraterritorial scope, and in each case Congress acted pursuant to a constitutional grant of lawmaking power" to extend U.S. jurisdiction over those offenses.

At the outset, we agree that Counts 2 through 6 do not depend on universal jurisdiction. Rather, they rely on the jurisdiction provided by the statutes themselves.

It is well-established that Congress may criminalize extraterritorial conduct. See, e.g., United States v. Ayesh, 702 F.3d 162, 166 (4th Cir. 2012) ("'Congress has the authority to apply its laws, including criminal statutes, beyond the

27

territorial boundaries of the United States'" (quoting United States v. Dawn, 129 F.3d 878, 882 (7th Cir. 1997))); EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 248 (1991) ("Both parties concede, as they must, that Congress has the authority to enforce its laws beyond the territorial boundaries of the United States"), superseded by statute on other grounds, Civil Rights Act of 1991, Pub. L. No. 102-166, § 109(a), 105 Stat. 1071, 1077.

To be sure, statutes extend extraterritorially only if Congress clearly so provides. See Morrison v. Nat'l Australia Bank Ltd., 130 S. Ct. 2869, 2877-78, 2883 (2010); see also Kiobel v. Royal Dutch Petroleum Co., 133 S. Ct. 1659, 1664-65 (2013) (applying the presumption against extraterritoriality). But when Congress provides a clear indication of extraterritoriality, U.S. jurisdiction is not limited to offenses criminalized under international law nor dependent on universal jurisdiction. United States v. Yousef, 327 F.3d 56, 91 (2d Cir. 2003) ("[I]rrespective of whether customary international law provides a basis for jurisdiction over [the defendant] for Counts Twelve thru Nineteen, United States law provides a separate and complete basis for jurisdiction over each of these counts and . . . United States law is not subordinate to customary international law or necessarily

subordinate to treaty-based international law and, in fact, may conflict with both").

In this case, the substantive statutes on which Counts 2 through 6 rest clearly manifest Congress' intent to criminalize conduct that takes place outside the municipal jurisdiction of the United States. Section 1203, on which Counts 2 and 3 are based, criminalizes hostage taking and provides:

> (a) Except as provided in subsection (b) of this section, whoever, whether <u>inside or outside the United States</u>, [takes hostages], shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment.
>
> (b)(1) It is not an offense under this section if the conduct required for the offense occurred outside the United States unless --
>
>> (A) the offender or the person seized or detained is a national of the United States;
>>
>> (B) <u>the offender is found in the United States</u>; or
>>
>> (C) the governmental organization sought to be compelled is the Government of the United States.

18 U.S.C. § 1203 (emphasis added). This statute explicitly reaches hostage taking anywhere in the world, so long as the offender ends up in the United States. In this case, Shibin was involved in hostage taking on the <u>Marida Marguerite</u> and was later found in Virginia, where he was prosecuted.

Section 2280, on which Counts 4 and 5 are based, criminalizes maritime violence and includes language similar to that in the hostage taking statute. It provides:

> (b) Jurisdiction. -- There is jurisdiction over the activity prohibited in subsection (a) --
>
>> (1) in the case of a covered ship, if --
>>
>>> (A) such activity is committed --
>>>
>>>> (i) against or on board a ship flying the flag of the United States at the time the prohibited activity is committed;
>>>>
>>>> (ii) in the United States; or
>>>>
>>>> (iii) by a national of the United States or by a stateless person whose habitual residence is in the United States;
>>>
>>> (B) during the commission of such activity, a national of the United States is seized, threatened, injured or killed; or
>>>
>>> (C) the offender is later found in the United States after such activity is committed;
>>
>> (2) in the case of a ship navigating or scheduled to navigate solely within the territorial sea or internal waters of a country other than the United States, if the offender is later found in the United States after such activity is committed; and
>>
>> (3) in the case of any vessel, if such activity is committed in an attempt to compel the United States to do or abstain from doing any act.

18 U.S.C. § 2280(b) (emphasis added). The term "covered ship," as used in § 2280(b), is defined as "a ship that is navigating

or is scheduled to navigate into, through or from waters beyond the outer limit of the territorial sea of a single country or a lateral limit of that country's territorial sea with an adjacent country." 18 U.S.C. § 2280(e). In this case, Shibin was involved in maritime violence against the <u>Marida Marguerite</u> in waters other than United States waters and was later found in Virginia, where he was prosecuted.

Finally, § 924(c), on which Count 6 is based, criminalizes the use or possession of a firearm in connection with a crime of violence. It is an ancillary crime that depends on the nature and reach of the underlying crime. Thus, its jurisdictional reach is coextensive with the jurisdiction of the underlying crime. As the statue provides:

> [A]ny person who, during and in relation to <u>any crime of violence</u> or drug trafficking crime . . . <u>for which the person may be prosecuted in a court of the United States</u>, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime . . . [be sentenced to an additional term of imprisonment].

18 U.S.C. § 924(c)(1)(A) (emphasis added). Thus, because Shibin could be prosecuted in the United States for hostage taking and maritime violence, he could also be prosecuted under § 924(c) for possessing, using, or carrying a firearm in connection with those crimes. See <u>United States v. Belfast</u>, 611 F.3d 783, 814 (11th Cir. 2010) (concluding that § 924(c) applies

31

extraterritorially because "a statute ancillary to a substantive offense statute is presumed to have extraterritorial effect if the underlying substantive offense statute is determined to have extraterritorial effect" (internal alterations and quotation marks omitted)); United States v. Hasan, 747 F. Supp. 2d 642, 684 (E.D. Va. 2010) (applying § 924(c) extraterritorially), aff'd sub nom. United States v. Dire, 680 F.3d 446 (4th Cir. 2012). Thus, as an ancillary crime to underlying crimes that apply extraterritorially, § 924(c) applies coextensively with the underlying crimes.

Congress' power to enact statutes that extend extraterritorially is derived generally from the Define and Punish Clause, U.S. Const. art. I, § 8, cl. 10; the Treaty Power, U.S. Const. art. II, § 2, cl. 2; and the Necessary and Proper Clause, U.S. Const. art. I, § 8, cl. 18.

Thus, § 1203, the hostage-taking statute, is constitutionally valid as the implementation of the International Convention Against the Taking of Hostages, December 17, 1979, T.I.A.S. No. 11,081. See United States v. Ferreira, 275 F.3d 1020, 1027-28 (11th Cir. 2001) (concluding that "Congress passed the Hostage Taking Act to implement the International Convention Against the Taking of Hostages" and that it was a valid exercise of congressional authority under

32

the Necessary and Proper Clause); United States v. Lue, 134 F.3d 79, 81-84 (2d Cir. 1998) (same).

Similarly, § 2280, punishing maritime violence, is constitutionally valid as the implementation of the Convention for the Suppression of Unlawful Acts Against the Safety of Maritime Navigation arts. 7, 11, March 10, 1988, 1678 U.N.T.S. 221. See United States v. Shi, 525 F.3d 709, 721 (9th Cir. 2008) ("In order to satisfy this obligation [of the Maritime Safety Convention], it was necessary for the United States to codify the Convention's 'extradite or prosecute' requirement into federal law. Section 2280 accomplishes this task"); cf. Yousef, 327 F.3d at 95-96 (discussing a similar provision in the Montreal Convention).

Finally, § 924(c), criminalizing gun use in connection with any crime of violence that can be prosecuted in the United States, is constitutionally valid under the Necessary and Proper Clause in connection with other statutes' implementation of treaties. See Lue, 134 F.3d at 84 (relying on M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316 (1819), for the rule that "the 'plainly adapted' standard requires that the effectuating legislation bear a rational relationship to a permissible constitutional end").

At bottom, we reject Shibin's argument that the district court did not have jurisdiction under "universal jurisdiction"

33

over the non-piracy counts related to the Marida Marguerite, Counts 2 through 6. Universal jurisdiction was irrelevant to the prosecution of those counts, and, we conclude, each of those counts is based on a statute that Congress validly applied to extraterritorial conduct, including Shibin's conduct.

V

Finally, Shibin contends that the district court abused its discretion in admitting into evidence the testimony of FBI Agent Kevin Coughlin, who was called as a witness to rebut testimony given by defense witness Mohamud Salad Ali. Agent Coughlin had conducted pretrial interviews of Salad Ali with the assistance of an FBI Somali linguist, who served as an interpreter. And as the interpreter gave Salad Ali's answers to the questions posed by Agent Coughlin, Coughlin made notes of what Salad Ali said.

During his testimony at trial, Salad Ali denied making some of the statements recorded in Agent Coughlin's notes. After Salad Ali concluded his testimony, the government called Agent Coughlin as a rebuttal witness, and Coughlin testified that Salad Ali did in fact make the statements he denied making. Shibin objected to the testimony because Agent Coughlin was repeating out-of-court statements of an absent declarant -- the interpreter -- and therefore Coughlin's testimony was inadmissible hearsay. The district court, however, overruled

34

the objection.  But it pointed out that Shibin could cross examine Agent Coughlin about the use of the interpreter and how the interview was conducted.  Shibin now contends that the district court's ruling was an abuse of discretion.

The government argues that Agent Coughlin's testimony was not inadmissible hearsay of the interpreter but rather admissible testimony of prior inconsistent statements made by Salad Ali.  See Fed. R. Evid. 801(c)(2) (defining hearsay as evidence offered "to prove the truth the matter asserted in the statement"); Fed. R. Evid. 613(b) (providing the procedure for admitting extrinsic evidence of a prior inconsistent statement).

We agree with the government that the district court did not abuse its discretion in admitting Agent Coughlin's testimony about Salad Ali's statements in the interview because they were admitted only as prior inconsistent statements.  And the absence in court of the interpreter did not render the statements inadmissible as hearsay because the interpreter was not the declarant, but only a "language conduit."  United States v. Vidacak, 553 F.3d 344, 352 (4th Cir. 2009) ("[E]xcept in unusual circumstances, an interpreter is no more than a language conduit and therefore his translation does not create an additional level of hearsay" (quoting United States v. Martinez-Gaytan, 213 F.3d 890, 892 (5th Cir. 2000) (internal quotation marks omitted)).  While interpreted testimony might be unusable

35

without the interpreter's presence in a circumstance "where the particular facts of a case cast significant doubt upon the accuracy of a translated confession," id., no such facts were presented in this case. Indeed, Agent Coughlin testified without contradiction that Salad Ali did not have any difficulty understanding the questions.

Shibin also raises for the first time on appeal a challenge under Crawford, arguing that the Confrontation Clause required the presence of the interpreter. See Crawford v. Washington, 541 U.S. 36, 59 (2004). He argues that "the absence of the interpreter at trial prevented [him] from being able to challenge by cross-examination, the reliability of the out-of-court statements that the government offered against him." Crawford, however, "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." United States v. Ayala, 601 F.3d 256, 272 (4th Cir. 2010) (quoting Crawford, 541 U.S. at 60 n.9). Here, the statements were introduced as prior inconsistent statements. The interpreter was nothing more than a language conduit. He translated the statements of Salad Ali and Agent Coughlin, both of whom were subject to cross examination.

Moreover, because we review Shibin's Crawford argument for plain error, Shibin must show that the error affected his substantial rights. See Fed. R. Crim. P. 52(b); United States

36

v. Olano, 507 U.S. 725, 734-35 (1993). Shibin, however, has made no mention of any substantial rights that were adversely affected. Indeed, Agent Coughlin's rebuttal testimony was not even critical to Shibin's convictions. Shibin admitted his involvement in the ransom negotiations of the Marida Marguerite, and his involvement in the Quest piracy was established by coconspirator testimony, Shibin's admissions, and the contents of Shibin's cell phone. In addition, Salad Ali himself testified that the investors of the Quest piracy could have chosen Shibin to be the negotiator without his knowledge.

In short, we reject Shibin's challenge to the district court's evidentiary ruling.

* * *

For the foregoing reasons, we affirm Shibin's judgments of conviction.

AFFIRMED