**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

No. 11-4266

OSAMA ESAM SALEEM AYESH,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T. S. Ellis, III, Senior District Judge.
(1:10-cr-00388-TSE-1)

Argued: September 20, 2012

Decided: December 18, 2012

Before TRAXLER, Chief Judge, DAVIS, Circuit Judge, and
Max O. COGBURN, Jr., United States District Judge
for the Western District of North Carolina,
sitting by designation.

Affirmed by published opinion. Judge Cogburn wrote the
opinion, in which Chief Judge Traxler and Judge Davis
joined.

## COUNSEL

**ARGUED:** Alan Hideto Yamamoto, Alexandria, Virginia, for Appellant. Ellen Ruth Meltzer, UNITED STATES DEPART-MENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Neil H. MacBride, United States Attorney, Alexandria, Virginia; Lanny A. Breuer, Assistant Attorney General, Criminal Division, Greg D. Andres, Acting Deputy Assistant Attorney General, Criminal Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

## OPINION

COGBURN, District Judge:

Appellant Osama Esam Saleem Ayesh ("Ayesh") appeals from a criminal judgment entered following a jury trial in the United States District Court for the Eastern District of Virginia. Ayesh was convicted by a jury on two counts of theft of public money (Counts 1 and 2), violations of 18 U.S.C. § 641, and on one count of committing acts affecting a personal financial interest (Count 3), a violation of 18 U.S.C. § 208(a). The District Court sentenced Ayesh to concurrent terms of imprisonment of 42 months on each count, followed by three years of supervised release. The District Court also ordered Ayesh to pay a fine of $5,000 and restitution of $243,416. On appeal, Ayesh contends that the district court improperly exercised extraterritorial jurisdiction over him for the counts of conviction, that it incorrectly denied his Motion to Suppress his post-arrest statements, and that the evidence was insufficient to sustain Ayesh's convictions for theft of public money. Finding no error, we affirm the district court.

## I.

## A.

On appeal, we consider the facts presented at trial in a light most favorable to the government, as the prevailing party at trial. *United States v. Jefferson*, 674 F.3d 332, 341 n.14 (4th Cir. 2012). Ayesh, a resident of Amman, Jordan, was hired by the U.S. Department of State to work as the shipping and customs supervisor at the U.S. Embassy in Baghdad, Iraq. While there, Ayesh devised a scheme to divert United States funds intended for shipping and customs clearance vendors to his wife's bank account in Jordan. As part of his scheme, Ayesh established a phony email account, obtained a blank invoice from a legitimate vendor, altered the document, and submitted fraudulent invoices and wire transfers in the name of the vendor. In addition, Ayesh also obtained self-inking signature stamps for the legitimate vendor, and kept all such instrumentalities in his living quarters, which were located on the grounds of the U.S. Embassy in Baghdad.

When U.S. officials suspected Ayesh's wrongdoing, they arranged for him to come to the United States under the pretext of attending a training seminar. Upon his arrival at Dulles International Airport, in Chantilly, Virginia, Ayesh was arrested and questioned by agents of the Federal Bureau of Investigation (the "FBI") and the U.S. Department of State (the "DOS"). After about five hours of questioning, Ayesh confessed.

## B.

On October 15, 2010, a grand jury returned a three-count indictment against Ayesh, charging him in two counts with theft of public money, in violation of 18 U.S.C. § 641, and in one count with committing acts affecting a personal financial interest, in contravention of 18 U.S.C. § 208(a). The district court denied Ayesh's motions to dismiss for lack of jurisdic-

tion, and to suppress his post-arrest statements. On February 2, 2011, a jury convicted Ayesh on all counts.

## II.

On appeal, Ayesh presents three contentions of error. First, Ayesh contends that the district court improperly exercised extraterritorial jurisdiction over him for violations of 18 U.S.C. §§ 208(a) and 641 occurring in Baghdad, Iraq. Second, he contends that the district court incorrectly denied his motion to suppress his post-arrest statements made to agents of the FBI and DOS upon his arrival at Dulles. Third, Ayesh contends that there was insufficient evidence to sustain his convictions for theft of public money. We address each contention in turn.

## A.

In his first contention, Ayesh argues that the district court lacked extraterritorial jurisdiction over him for acts that occurred outside the United States. Whether the district court had subject matter jurisdiction is a question of law subject to de novo review. *United States v. Barton*, 26 F.3d 490, 491 (4th Cir. 1994).

"Congress has the authority to apply its laws, including criminal statutes, beyond the territorial boundaries of the United States." *United States v. Dawn*, 129 F.3d 878, 882 (7th Cir. 1997). *See also United States v. Bowman*, 260 U.S. 94, 97-98 (1922). Whether Congress has exercised that authority is a matter of statutory construction and, generally, statutes enacted by Congress, including criminal statutes, apply only within the territorial jurisdiction of the United States. *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991).

The Supreme Court in *Bowman* held that if Congress intends for overseas crimes "against private individuals or their property . . . which affect the peace and good order of

the community," to be punished in this country, "it is natural for Congress to say so in the statute, and failure to do so will negative the purpose of Congress in this regard." *Bowman*, 260 U.S. at 98. But that is not the end of the analysis. The Court went on to say that "the same rule of interpretation" should not be applied to criminal statutes that are "not logically dependent on their locality for the government's jurisdiction, but are enacted because of the right of the government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers, or *agents*." *Id.* (emphasis added). In such cases, congressional intent may be "inferred from the nature of the offense." *Id.* The Court added that to apply such a statute only territorially would "[g]reatly . . . curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed by citizens on the high seas and in foreign countries as at home." *Id.*

Clearly, as with the statute in *Bowman* criminalizing fraud against a corporation in which the United States is a stockholder, congressional intent to exercise overseas jurisdiction can be inferred from the nature of the offenses criminalized by 18 U.S.C. §§ 208(a) and 641. Otherwise, government employees, contractors, or agents like Ayesh—be they United States citizens or foreign nationals—would be at liberty to pilfer public money or engage in acts of self-dealing with impunity so long as they did so abroad. Thus, we find that the district court's exercise of extraterritorial jurisdiction was consistent with Congress's intent that 18 U.S.C. §§ 208(a) and 641 be applied abroad.

We further find that extraterritorial application of these statutes comported with international law. *See Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch.) 64, 118 (1804) ("an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains"). The district court's exercise of jurisdiction is supported by the protective principle of international law, which "permits a

nation to assert subject matter criminal jurisdiction over a person whose conduct outside the nation's territory threatens the national interest." *United States v. Alomia-Riascos*, 825 F.2d 769, 771 (4th Cir. 1987). Extraterritorial jurisdiction was also appropriate under the territorial principle, which permits jurisdiction "over all acts which take effect within the sovereign even though the author is elsewhere." *Rivard v. United States*, 375 F.2d 882, 886 (5th Cir. 1967) (citing *Ford v. United States*, 273 U.S. 593 (1927)). Both statutes criminalize conduct that has effects within the United States and threatens the operation of this nation's governmental functions.

Finally, the district court's exercise of extraterritorial jurisdiction comported with due process. *See United States v. Brehm*, 691 F.3d 547, 552 (4th Cir. 2012). As the district court noted, Ayesh's "employment with the Department of State at the United States Embassy in Baghdad was central to the commission of his alleged crimes." J.A. 1384. Moreover, Ayesh lived on the embassy compound, and was provided with a copy of the Foreign Service National Handbook, which advised him that he was subject to the laws and regulations of the United States. *Id.* at 687, 693–94. 698.

Thus, despite the fact that Ayesh is a foreign national and all of the acts occurred in Jordan and Iraq, the district court properly exercised extraterritorial jurisdiction over him. Finding no error in the district court's denial of Ayesh's motion to dismiss, we affirm.

### B.

In his second contention, Ayesh argues that the district court incorrectly denied his motion to suppress his post-arrest statements to FBI and DOS agents. In reviewing a district court's ruling on a motion to suppress, this Court reviews the lower court's factual findings for clear error and its legal conclusions de novo. *United States v. Richardson*, 607 F.3d 357, 369 (4th Cir. 2010), *cert. denied*, 131 S. Ct. 427 (2010).

Because the district court denied the motion, this Court construes the evidence in the light most favorable to the government. *United States v. Black*, 525 F.3d 359, 364 (4th Cir. 2008).

1.

Ayesh argues here, as he did below, that because he made the statements during a lengthy interview after traveling from Jordan for 19 hours without sleep or food, the statements he made upon his arrival in the United States were involuntary and coerced.

It is undisputed that Ayesh was shadowed in his travels by a DOS Office of the Inspector General ("OIG") agent, who flew on the same plane and observed Ayesh after he landed at JFK International Airport, in New York, and then, after a six hour layover, at his final destination, Dulles. The record below indicates that the agent remarked that Ayesh looked "fine" upon arriving in New York.

After he retrieved his checked luggage in Dulles, Ayesh was arrested in the baggage claim area at 12:34 p.m. Agents took custody of his bags and transported him to an FBI office directly outside the airport. They did not question Ayesh during the ride, and when they arrived at the interview room a few minutes later, they removed his handcuffs and offered him food and drink, which he declined, and a bathroom break, which he accepted.

At 12:55 p.m., FBI Special Agent John Longmire and DOS-OIG Special Agent Lloyd Rawls began explaining to Ayesh the reasons for his arrest, the charges filed against him, and his *Miranda* rights. When the agents began speaking to Ayesh, they asked him multiple times if he was sufficiently fluent in English to conduct an interview and if he wanted an Arabic translator. He declined, asserted that he was fluent in English, and said that he could read, write, speak, and under-

stand the language. The agents provided an Advice of Rights form to Ayesh in both English and Arabic, read the enumerated rights verbatim to Ayesh, and explained the meaning of each one to him.

Ayesh asked the agents some questions about expected court procedures, and after providing Ayesh another bathroom break, the agents adjourned to confer with the prosecutor. About 15 minutes later, after they relayed the prosecutor's answers, Agent Longmire again reviewed the Advice of Rights form with Ayesh, once more reading and explaining each right listed. After Ayesh stated that he understood his rights and initialed each line on the English version of the form, Agent Longmire read the consent language to Ayesh, who responded that he wanted to proceed without a lawyer and signed the form at 1:42 p.m. Prior to signing, Ayesh never said that he was tired, and never indicated to the agents in any manner that he was fatigued.

The agents then began interviewing Ayesh. Ayesh paid complete attention to the agents' questions, had inflection in his voice, was animated, and used hand gestures for emphasis. He answered the questions in complete sentences and sometimes provided substantial detail in his responses. He took notes during the interview and sometimes enhanced his answers with illustrations. Ayesh never said that he was fatigued or needed sleep, and he did not appear either physically or mentally tired. In short, there was nothing to indicate that he was confused or not thinking clearly.

When the agents confronted Ayesh with evidence that contradicted his responses, he smiled, laughed, and asked how they knew the information. Ayesh took additional bathroom breaks at 4:10 p.m. (for 20 minutes), and at 5:00 p.m. (for 5 minutes). He never requested a break that was not provided, and the agents offered him food and drink on several occasions. He declined each time, although Agent Longmire observed Ayesh drinking from a water fountain during one of

the breaks. The interview concluded between 6:00 and 6:10 p.m. The FBI later inventoried the items in Ayesh's carry-on bag. They included six candy bars, a package of cookies, and two packages of crackers. There also were roasted seeds scattered throughout Ayesh's bag. In all, the interview lasted less than six hours.

2.

A statement is involuntary within the meaning of the Due Process Clause when it is "extracted by . . . threats or violence" or "obtained by . . . direct or implied promises" or "the exertion of . . . improper influence." *Hutton v. Ross*, 429 U.S. 28, 30 (1976). The pivotal inquiry is whether the defendant's will has been "overborne" or his or her "capacity for self-determination critically impaired." *United States v. Pelton*, 835 F.2d 1067, 1071-72 (4th Cir. 1987) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)).

In determining whether a confession was voluntary, we must examine the totality of the circumstances, including the nature of the police activity, as well as the defendant's situation. *See Arizona v. Fulminante*, 499 U.S. 279, 285 (1991). Relevant considerations may include the length and nature of the questioning, any promises or threats made, and any deprivation of essentials (e.g., food, water, sleep, and bathroom breaks) imposed upon the defendant. *United States v. Van Metre*, 150 F.3d 339, 348 (4th Cir. 1998) (confession voluntary despite 55-hour delay between arrest and arraignment because defendant was not harmed, threatened, held in seclusion, or deprived of food and rest). Other considerations may include an assessment of the defendant's personal attributes, such as his age, education, intelligence, and mental state. *Fulminante*, 499 U.S. at 286 n. 2.

We conclude that the district court correctly determined that Ayesh's statements "were freely and voluntarily given." The district court's factual findings that Ayesh is intelligent,

highly educated, and of sufficient maturity and experience to have understood his constitutional rights and communicated effectively with his questioners are not clearly erroneous based on the record before us. Indeed, Ayesh is fluent in written and spoken English, he declined the agents' offer of a translator, he initialed each of his *Miranda* rights on the Advice of Rights form, and he then signed the form indicating that he understood his rights and that he was waiving them. Further, as the district court noted, throughout the interview, Ayesh "asked intelligent questions and spoke confidently on his own behalf." J.A. 432. Clearly, an interrogation of less than six hours is not of a "constitutionally offensive duration." J.A 434. *See United States v. Gray*, 137 F.3d 765, 768, 772 (4th Cir. 1998) (holding that defendant's statements were voluntary even though defendant had been handcuffed, left alone in a police station room for almost two hours, then interviewed for five hours).

Based on consideration of the totality of the circumstances surrounding the interview, Ayesh's will was not overborne and his capacity for self-determination was not impaired. Finding no error in the district court's denial of the motion to suppress, we affirm.

## C.

Finally, Ayesh contends that there was insufficient evidence to sustain his convictions on the two counts of theft of public money. This court reviews challenges to the sufficiency of the evidence de novo.[1] *United States v. Penniegraft*,

---

[1]The government contends that the court should apply a plain error standard, arguing that Ayesh failed to file a motion for acquittal under Fed. R. Crim. P. 29. Appellee's Br. 39-40. Close review of the joint appendix reveals that nine days after verdict, Ayesh filed not one but two motions for acquittal. *See* J.A. 10 (Docket Entries 75-76). The district court disposed of such motions by written Order, *id.* (Docket Entry 93) & 2003, which incorporated its oral decision on the Rule 29 motions announced from the bench at the time of sentencing, J.A. 1945-51.

641 F.3d 566, 571 (4th Cir. 2011), *cert. denied*, 132 S. Ct. 564 (2011). To establish a violation of the theft of public money statute, the government must prove beyond a reasonable doubt each of the following elements: (1) the defendant stole or converted something of value for his own use; (2) the thing of value belonged to the United States; and (3) the defendant did so knowingly and with the intent to deprive the owner of the use or benefit of the money. *United States v. Rehak*, 589 F.3d 965, 973 (8th Cir. 2009), *cert. denied*, 130 S. Ct. 2130 (2010). Taken in a light most favorable to the government, the jury had more than sufficient evidence to convict Ayesh, as review of the trial transcript reveals that the government produced evidence as to each element.

Ayesh challenges the sufficiency of the evidence as to the third element of the § 641 offenses, which requires that the government prove that he had the intent to deprive the United States of the use or benefit of the money. The fact that the government may have actually received the specified goods and services does not negate criminal intent.[2] On this issue,

---

[2]Indeed, at least four circuits—the First, Fifth, Seventh, and D.C. Circuits—have found that the Government need not prove an actual loss to establish a violation of § 641. *See United States v. Herrera-Martinez*, 525 F.3d 60, 62, 64 (1st Cir. 2008) (affirming the conviction of a defendant who used another person's name and identifying information to obtain a federal housing voucher); *United States v. Milton*, 8 F.3d 39, 41, 44 (D.C. Cir. 1993) (affirming the convictions of two brothers who helped others submit false claims for back pay under a settlement agreement between an employer and the Equal Employment Opportunity Commission); *United States v. Barnes*, 761 F.2d 1026, 1027–28, 1033 (5th Cir. 1985) (affirming the convictions of two defendants who applied for and authorized fraudulent livestock loans from the Farmers Home Administration, even though the money had actually been used to buy livestock); *United States v. Bailey*, 734 F.2d 296, 298–301 (7th Cir. 1984) (affirming the conviction of a defendant attorney who had embezzled portions of loans issued by the Farmers Home Administration). *But see United States v. Collins*, 464 F.2d 1163, 1164–65 (9th Cir. 1972) (reversing a conviction under § 641 after finding that the money that the defendant had stolen by forging and negotiating government-issued checks had belonged to a bank, not the government).

the court instructed the jury in the definitional and concluding instruction, as follows:

> you may find the defendant guilty, even if you find that the government received some service or benefit as a result of the defendant's action, or that the defendant may thereafter have used some portion of the United States Government funds to pay some vendor for government services after the United States Government funds were deposited in his wife's bank account in Jordan.

J.A. 1781. The government presented evidence that Ayesh knew at the time he committed such acts that it was illegal to keep any of the funds for himself. J.A. 1633. The evidence was more than sufficient for the jury to find that Ayesh intended to deprive the United States of the use and benefit of the funds wired to his wife's bank account.

We find that sufficient evidence was presented to the jury as to each element of the charged § 641 offenses to sustain the verdict, and, accordingly, we affirm the district court's denial of Ayesh's Rule 29 motions.

### III.

In sum, we affirm the District Court's judgment in its entirety.

*AFFIRMED*