**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-2338**

SARAH ROE,

> Plaintiff – Appellee,

v.

LINDA HOWARD,

> Defendant – Appellant,
>
and

ESTATE OF RUSSELL HOWARD,

> Defendant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Liam O'Grady, District Judge. (1:16-cv-00562-LO-JFA)

Argued: October 30, 2018                        Decided: February 25, 2019

Before WILKINSON, KING, and QUATTLEBAUM, Circuit Judges.

Affirmed by published opinion. Judge King wrote the opinion in which Judge Wilkinson and Judge Quattlebaum joined.

**ARGUED:** Richard Francis Rinaldo, JONES, GREGG, CREEHAN & GERACE LLP, Pittsburgh, Pennsylvania, for Appellant. Melissa Lim Patterson, JONES DAY, Washington, D.C., for Appellee. **ON BRIEF:** Timothy J. Battle, Alexandria, Virginia,

for Appellant. Alison B. Marshall, Christian G. Vergonis, JONES DAY, Washington, D.C., for Appellee.

———————————

KING, Circuit Judge:

Defendant Linda Howard appeals from a judgment entered against her in the Eastern District of Virginia after a jury found her civilly liable to plaintiff Sarah Roe under the Trafficking Victims Protection Act (the "TVPA").[1] Roe had sued Howard for her role in sexual abuse that Roe suffered at the hands of Russell Howard, Linda's husband, when Roe worked in 2007 as the Howards' housekeeper in housing provided by the Embassy of the United States in Yemen.[2] The jury found that Linda's conduct in Yemen contravened criminal provisions of the TVPA and thus awarded Roe $3 million in damages pursuant to the TVPA's civil remedy provision. *See* 18 U.S.C. § 1595. On appeal, Linda challenges the district court's denial of her post-trial motion for judgment as a matter of law, wherein she sought relief on the ground that, in 2007, the TVPA's civil remedy provision did not apply extraterritorially. Linda also challenges the court's admission of testimonial evidence from another former housekeeper of Linda and Russell whom they had similarly abused. As explained below, we are satisfied to affirm the judgment.

---

[1] The TVPA is generally codified at 18 U.S.C. § 1581 *et seq*.

[2] To avoid confusion, we generally refer to Linda Howard and Russell Howard by their first names, that is, simply as Linda and Russell. We refer to the plaintiff by her pseudonym "Sarah Roe," pursuant to the district court's ruling in that regard. *See Roe v. Howard*, No. 16-cv-562 (E.D. Va. May 27, 2016), ECF No. 11.

I.

A.

On July 31, 2017, following a four-day trial, a jury in the Eastern District of Virginia found Linda Howard civilly liable for contravening criminal provisions of the TVPA. More specifically, the jury found that Linda had engaged in forced labor in violation of 18 U.S.C. § 1589, forced labor trafficking in violation of § 1590, commercial sex trafficking in violation of § 1591, and conspiring to engage in those offenses in violation of § 1594. *See* J.A. 115-17.[3]

When we review an appeal following a jury verdict, we view the trial evidence in the light most favorable to the prevailing party. *See Randall v. Prince George's Cty.*, 302 F.3d 188, 195 n.8 (4th Cir. 2002) (citing *Lowery v. Cir. City Stores, Inc.*, 206 F.3d 431, 442-43 (4th Cir. 2000)). We are likewise obliged to accord the prevailing party the benefit of all reasonable inferences to be drawn from the evidence. *See Lowery*, 206 F.3d at 443. The facts recited herein are taken in that light and drawn from the record, which includes evidence presented at trial and the parties' joint submission of stipulated facts.

1.

Linda is an American citizen. She began working for the Department of State in 1991 as a Communications Officer in Paris, France. In Paris, Linda met and married Russell, an Australian citizen who then worked for the Australian Embassy in France.

---

[3] Citations herein to "J.A.__" refer to the contents of the Joint Appendix filed by the parties in this appeal.

Over the next decade, Linda and Russell held similar postings around the world, usually arranging their assignments so that they could pursue their careers in the same country. In 2001, Russell retired from his position with the Australian government, and he thereafter followed Linda as she continued her career with the State Department.

In 2005, the State Department assigned Linda to our Embassy in Sana'a, Yemen. Russell accompanied Linda to Sana'a and also found work at the Embassy. Among other jobs, Russell performed administrative work for the Embassy Commissary. In Sana'a, Linda and Russell lived in housing provided by the State Department, and they were protected by U.S. government security. Linda and Russell remained in Sana'a for approximately three years. Around December 2008, Linda and Russell moved to Japan, where Linda received her next State Department posting. By 2012, Linda and Russell had relocated to Melbourne, Australia, where Russell died of pancreatic cancer that September. Linda continues to reside in Melbourne.

2.

Sarah Roe first met the Howards in September 2005, soon after their arrival in Yemen. At that time, Roe was twenty years old. Born into an impoverished family in Ethiopia, Roe had moved to Yemen to seek work, and she initially secured various housekeeping and cleaning jobs. In September 2005, Roe was employed there as a waitress at a restaurant on U.S. Embassy grounds called Uncle Sam's. It was at Uncle Sam's that the Howards first encountered Roe and sought to befriend her.

As one of his odd jobs around the U.S. Embassy, Russell worked in a shop next door to Uncle Sam's. He first introduced himself to Roe, and then introduced Roe to

5

Linda. Both Howards paid special attention to Roe: they complimented her appearance, initiated friendly conversations, and encouraged her to work for them as their live-in housekeeper. At first Roe declined the job offer, and Russell asked her to help "find a beautiful woman like [her]self to work in [the Howards'] home." *See* J.A. 232. Linda would stop by Uncle Sam's three or four times a week, where she would "greet" and "hug" Roe. *Id.* at 231. Linda even gave Roe her personal phone number. *Id.* at 234.

Around 2006, Roe returned to Ethiopia from Yemen for several months to care for her mother. As a result, she lost her job at Uncle Sam's. When Roe returned to Sana'a, a young Ethiopian woman named Sabha was then employed as the Howards' live-in housekeeper, but Linda helped Roe obtain a data-entry job at the U.S. Embassy. Linda gave Roe an application for the data-entry position and taught her how to use a basic data-entry program on Linda's home computer. After Roe got the job, Linda continued to befriend her, meeting Roe to talk about her hair stylist and other non-work matters. Linda presented herself to Roe "as a friend, someone very easy to talk to, someone with a very good heart." *See* J.A. 239. Linda also promised to help Roe find another job after the data-entry position ended. Roe believed Linda offered such help because Linda "really liked" her. *Id.* at 241.

Some months later, in the spring of 2007, the Howards' then live-in housekeeper (another young Ethiopian woman named Brhan) left them. At the time, Roe was looking for a new job and the Howards renewed their offer to Roe to fill the housekeeping position. Roe was uncertain about accepting the Howards' offer. She made more money when she had jobs that allowed her to accept tips, like waitressing. Roe also had her own

6

apartment and did not want to move in with the Howards, which was a requirement of the position. But the Howards offered to help Roe get medical treatment for an eye ailment, renew her work visa, and aid her family in Ethiopia. Linda also "knew that [Roe] had a desire to improve [her] language skills," and promised that Russell could help her with her English. *See* J.A. 247. As part of their discussions about the live-in position, Linda explained to Roe "that Russell is usually at home, he needs a friend." *Id*. Linda told Roe that "the main part of this job is to make Russell happy." *Id*. at 250. Roe understood this to mean that "doing my job, cleaning, doing everything else was what was going to make him happy." *Id*. Roe accepted the position and agreed to move in with the Howards. She began working for the Howards in June 2007.

Once Roe moved into the Howards' apartment, she discovered that, although she had her own room and bathroom, the door to her room could not be locked without a key. The Howards told Roe they did not have the key. The Howards then presented Roe with a uniform consisting of a "very short" skirt and a blouse that "looked like something you would wear . . . when you go out." *See* J.A. 253. Linda had made the outfit herself.

When Roe refused to wear the uniform, Russell took Roe to the mall to go shopping. At the mall, he purchased a "very revealing" "one-piece" that "open[ed] in the front," and "underwear . . . with one tiny string" and "many holes." *See* J.A. 253. Back at the apartment, Russell asked Roe to put on the new purchases "and show him what it looks like." *Id*. at 254. Roe refused again and went to the kitchen to prepare Russell's lunch. She then retired to her room. Suddenly, Russell entered the room, naked. Roe tried to escape but Russell cornered her, pinned her down on the bed, and raped her.

7

Russell continually raped and sexually assaulted Roe for the duration of her time with the Howards. He repeatedly threatened Roe to maintain her silence: he verbally abused her, he warned Roe that he could have her thrown in jail, he threatened to tell her religiously conservative family about the assaults, and he retained possession of her passport.

As the district court succinctly put it in its post-trial opinion, "Linda Howard was aware of these assaults." *See* J.A. 145-46. Linda often watched as Russell touched Roe's rear end and breasts. Roe overheard Russell talking to Linda on the phone about the assaults, including complaining that Roe "wasn't like Brhan." *Id*. at 258, 334. Roe knew it was Linda on the other end of the line based on the nature and content of those conversations. On one occasion, Russell related events to Linda over the phone as he took Roe to a hospital to have an intrauterine contraceptive device implanted. Russell also told Roe that he talked to Linda about the rapes.

Eventually, Roe's continued resistance to Russell's repeated assaults and open, abject misery so enraged Russell that he fired her in December 2007. Linda then helped Roe obtain another restaurant job near the Howards' apartment and wrote a letter of recommendation for her. Even then, Russell would often stop by the restaurant to threaten Roe to maintain her silence about the rapes he had perpetrated.

B.

Congress enacted the TVPA in the year 2000 "to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." TVPA, Pub. L. No. 106-386, § 102(a), 114 Stat. 1464, 1466 (codified at 22

8

U.S.C. § 7101(a)). The congressional findings that accompanied the TVPA in its original form repeatedly emphasized the transnational nature of human trafficking and sexual exploitation, and the enforcement challenges posed by the international scope of that criminal activity. *See id*., § 102(b), 114 Stat. at 1466-69.

By way of the TVPA, Congress created several new federal criminal offenses intended to more comprehensively and effectively combat human trafficking. Among other provisions, the TVPA criminalized: "Forced labor," "[t]rafficking with respect to peonage, slavery, involuntary servitude, or forced labor," and "[s]ex trafficking of children or by force, fraud or coercion." *See* TVPA, § 112(a)(2), 114 Stat. at 1486-88. Those provisions are respectively codified at 18 U.S.C. §§ 1589, 1590, and 1591, all within chapter 77 of Title 18.

In 2003, Congress reauthorized and amended the TVPA. *See* Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, 117 Stat. 2875 (the "2003 TVPRA"). In the findings accompanying the 2003 TVPRA, Congress stressed the challenges that remained "in responding to the needs of victims of trafficking in the United States and abroad." *See id*., § 2(2), 117 Stat. at 2875. As part of the 2003 TVPRA amendments, Congress added a civil remedy provision to chapter 77. *See* 2003 TVPRA, § 4(a)(4)(A), 117 Stat. at 2878. That civil remedy provision is codified at 18 U.S.C. § 1595(a), which provides:

> (a) An individual who is a victim of a violation of [chapter 77] may bring a civil action against the perpetrator . . . in an appropriate district court of the United States and may recover damages . . . .

9

The 2003 TVPRA also amended § 1591, which prohibits "[s]ex trafficking of children or by force, fraud, or coercion." That amendment altered § 1591 to expressly apply to acts committed "within the special maritime and territorial jurisdiction of the United States." *See* 2003 TVPRA, § 5(a)(2), 117 Stat. at 2879. The phrase "special maritime and territorial jurisdiction of the United States" is a term of art defined elsewhere in the U.S. Code. That term encompasses a variety of locations under varying degrees of control by the United States and includes, with respect to offenses committed by U.S. nationals, the grounds of U.S. diplomatic installations and related premises. *See* 18 U.S.C. § 7(9). Specifically, § 7(9) defines the term to reach:

> (A) the premises of United States diplomatic, consular, military or other United States Government missions or entities in foreign States, including the buildings, parts of buildings, and land appurtenant or ancillary thereto or used for purposes of those missions or entities, irrespective of ownership; and
>
> (B) residences in foreign States and the land appurtenant or ancillary thereto, irrespective of ownership, used for purposes of those missions or entities or used by United States personnel assigned to those missions or entities.

*See id.*

In 2006, Congress again reauthorized the TVPA. *See* Trafficking Victims Protection Reauthorization Act of 2005, Pub. L. No. 109-164, 119 Stat. 3558 (effective Jan. 10, 2006) (the "2005 TVPRA"). This time, Congress expressly found that "[t]he involvement of employees and contractors of the United States Government . . . in trafficking in persons, facilitating the trafficking in persons, or exploiting the victims of trafficking in persons is inconsistent with United States laws and policies and undermines

10

the credibility and mission of the United States Government programs in post-conflict regions." *See id*., § 2(10), 119 Stat. at 3559. Accordingly, Congress further expanded the TVPA's extraterritorial reach by providing:

> Whoever, while employed by . . . the Federal Government outside the United States, engages in conduct outside the United States that would constitute an offense under chapter 77 . . . of this title if the conduct had been engaged in within the United States or within the special maritime and territorial jurisdiction of the United States shall be punished as provided for that offense.

*See id*., § 103, 119 Stat. at 3562 (codified at 18 U.S.C. § 3271). Each of the statutory provisions and amendments discussed heretofore was in effect between June and December 2007, when the Howards exploited and abused Roe.

In 2008, after Roe had left the Howards, Congress further amended and reauthorized the TVPA. *See* William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 122 Stat. 5044 (the "2008 TVPRA"). The 2008 TVPRA further expanded the extraterritorial reach of the TVPA by providing:

> In addition to any domestic or extra-territorial jurisdiction otherwise provided by law, the courts of the United States have extra-territorial jurisdiction over any offense (or any attempt or conspiracy to commit an offense) under section . . . 1589, 1590, or 1591 if—
>
> (1) an alleged offender is a national of the United States . . . .

*See id*., § 223, 122 Stat. at 5071 (codified at 18 U.S.C. § 1596). The 2008 TVPRA also expanded chapter 77 to prohibit conspiracy to commit the offenses codified at, inter alia, 18 U.S.C. §§ 1589, 1590, and 1591. *See id*., § 222, 122 Stat. at 5070 (codified at 18 U.S.C. § 1594(b)-(c)).

11

C.

In May 2016, Roe sued Linda in the Eastern District of Virginia pursuant to the TVPA civil remedy provision codified at 18 U.S.C. § 1595.[4] *See* J.A. 15. Roe alleged that Linda had violated multiple criminal provisions of the TVPA, including its prohibitions of forced labor under 18 U.S.C. § 1589, forced labor trafficking under § 1590, commercial sex trafficking under § 1591, and conspiracy to engage in those offenses under § 1594.

Before trial, Linda sought summary judgment on the grounds that the TVPA did not apply extraterritorially to reach her conduct in 2007, and that the 2008 amendments expanding its extraterritorial application did not apply retroactively. The district court denied that request without prejudice after argument.

Linda also filed a motion in limine to exclude the testimony of Jane Doe, a live-in housekeeper who worked for the Howards after Roe was fired.[5] The district court denied that motion and ruled that Doe's testimony was admissible under either Rule 404(b) or Rule 415 of the Federal Rules of Evidence. Roe's claims proceeded to trial in Alexandria on July 26, 2017.

---

[4] Roe originally sued Russell's estate in addition to Linda, but later dismissed the estate as a defendant in these proceedings. *See Roe v. Howard*, No. 16-cv-562 (E.D. Va. July 26, 2017), ECF No. 78.

[5] The district court permitted Jane Doe to testify using this pseudonym. *See* J.A. 156.

12

In accordance with the district court's ruling, Jane Doe took the stand at trial. Like Roe, Doe was a young Ethiopian woman who came to Yemen in search of work. Doe testified, inter alia, that she began working for the Howards in Sana'a as a live-in housekeeper in 2008. Doe followed the Howards to Tokyo when they relocated at the end of that year, based in part on the Howards' promises that they would increase her pay and help her obtain health insurance. Such insurance was a benefit of particular value to Doe, who had "kidney issues." *See* J.A. 162-63. Doe knew no one in Japan other than the Howards and did not speak Japanese.

Shortly after Doe and the Howards arrived in Tokyo, Russell's behavior toward Doe changed. Doe testified, over objection, that Russell told her about "some of the ways he abused his former employees." *See* J.A. 165. She described how Russell began to touch her inappropriately, on her butt and thigh. Doe then testified that Russell cornered her in her bedroom in the Howards' home and raped her. Russell raped Doe repeatedly during her employment with the Howards. Doe testified, over objection, that Russell told her that Linda knew "everything that is happening." *Id.* at 174. Doe also related that, after they had arrived in Tokyo, Linda told Doe "to make sure that I please [Russell], and that's my primary job, that she didn't want him to be mad." *Id.* at 175. Some months later, while Doe and the Howards were still in Tokyo, Russell fired Doe and threatened to have her deported.

On July 31, 2017, after additional testimony and stipulated submissions consistent with the preceding recitation of facts, the jury returned its verdict. The jury found Linda liable for each of the four alleged violations of the TVPA. The jury calculated Roe's

13

compensatory damages at $1 million for each violation. The jury found, however, that those compensatory damages were duplicative, and thus awarded Roe $1 million in total compensatory damages. The jury also awarded Roe $2 million in punitive damages. *See* J.A. 115-17.

In September 2017, Linda filed multiple post-trial motions seeking to overturn the jury's verdict. As relevant to this appeal, Linda sought a new trial pursuant to Federal Rule of Civil Procedure 59(a), contending that the district court had erred in admitting Doe's testimony. Linda also renewed her Rule 50 motion for judgment as a matter of law on the grounds that the TVPA did not apply to her extraterritorial conduct in 2007, and that the 2008 TVPRA amendments did not apply retroactively. In October 2017, the court denied Linda's post-trial motions. The court then entered judgment in favor of Roe in accordance with the verdict.

In January 2018, the district court issued a post-trial opinion that addressed, inter alia, Linda's contention that the TVPA's civil remedy provision did not apply extraterritorially to reach her conduct in Yemen in 2007. *See Roe v. Howard*, No. 16-cv-562 (E.D. Va. Jan. 3, 2018), ECF No. 125. The court ruled that, under the version of the TVPA in effect in 2007, the presumption against extraterritoriality was rebutted with respect to Linda's relevant conduct. Specifically, the court applied the Supreme Court's decision in *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013), and this Court's decision in *Al Shimari v. CACI Premier Tech., Inc.*, 758 F.3d 516 (4th Cir. 2014), to conclude that Linda's conduct sufficiently "touche[d] and concern[ed] the United States" to displace the presumption against extraterritoriality. *See* J.A. 148-49. Alternatively,

14

the court determined that 18 U.S.C. § 1596, enacted in 2008, could apply retroactively and supported the extraterritorial application of the TVPA civil remedy provision to Linda's conduct.

Linda has timely appealed the judgment of the district court, and we possess appellate jurisdiction pursuant to 28 U.S.C. § 1291.

II.

We review de novo a district court's denial of a Rule 50 motion for judgment as a matter of law, viewing the evidence in the light most favorable to the nonmoving party. *See Fontenot v. Taser Int'l, Inc.*, 736 F.3d 318, 332 (4th Cir. 2013). We also review de novo "the conclusions of law on which the court's denial of judgment as a matter of law was premised." *Adkins v. Crown Auto, Inc.*, 488 F.3d 225, 231 (4th Cir. 2007). Our de novo review extends to all questions of statutory interpretation encompassed therein. *See, e.g.*, *Stone v. Instrumentation Lab. Co.*, 591 F.3d 239, 242-43 (4th Cir. 2009).

By contrast, we review a district court's denial of a Rule 59 motion for a new trial for abuse of discretion, and we will reverse only "in the most exceptional circumstances." *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 346 (4th Cir. 2014). Likewise, we review rulings on the admissibility of evidence, including testimony, for abuse of discretion. *See, e.g.*, *United States v. Vidacak*, 553 F.3d 344, 348 (4th Cir. 2009).

15

III.

Linda seeks to overturn the jury verdict against her by challenging two of the district court's rulings in the proceedings below. First, Linda maintains that the court erred in concluding that the TVPA's civil remedy provision applied to her extraterritorial conduct in 2007, and thus erred in denying her motion for judgment as a matter of law. By her second contention, Linda argues that the court erred in admitting Jane Doe's trial testimony regarding her abuse by the Howards in 2008. We address each contention in turn.

A.

Linda seeks to vacate the judgment against her on the ground that the TVPA's civil remedy provision, codified at 18 U.S.C. § 1595, did not apply extraterritorially before 2008. Linda contends that this precludes any liability for her conduct toward Roe, which took place in Yemen in 2007. The district court rejected that argument when it denied Linda's post-trial motion for judgment as a matter of law. In so ruling, the court relied on the Supreme Court's decision in *Kiobel v. Royal Dutch Petroleum Co.*, and concluded that Linda's conduct sufficiently "touch[ed] and concern[ed] the United States" to displace the presumption against extraterritoriality. *See* J.A. 149 (citing *Kiobel*, 569 U.S. 108, 124-25 (2013)). Alternatively, the court determined that 18 U.S.C. § 1596 — which expanded the extraterritorial reach of the TVPA in 2008 — applied retroactively and sustained Linda's liability under the TVPA.

As explained below, we affirm the district court and conclude that the TVPA's civil remedy provision applied to Linda's conduct in Yemen in 2007. We reach this

16

conclusion, however, based on a somewhat different analysis than that employed by the district court. *See United States v. Smith*, 395 F.3d 516, 519 (4th Cir. 2005) (confirming that this Court "may affirm on any grounds apparent from the record"). Specifically, we rely on the Supreme Court's more recent decision on extraterritoriality in *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090 (2016). Adhering to the framework explained in *RJR Nabisco*, we ground our ruling on the text and structure of the relevant TVPA provisions. Pursuant to our analysis, we are satisfied that the TVPA's civil remedy provision applied to Linda's conduct toward Roe in 2007.

1.

Congress has the undisputed authority to apply its laws beyond "the territorial boundaries of the United States." *See United States v. Ayesh*, 702 F.3d 162, 166 (4th Cir. 2012). Whether it has exercised that authority "is a matter of statutory construction." *Id.* (citing *E.E.O.C. v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991), *superseded in part by statute*, Civil Rights Act of 1991, Pub. L. 102-166, 105 Stat. 1074, *as recognized in Landgraf v. USI Film Prods.*, 511 U.S. 244, 251 (1994)). The canon of statutory interpretation known as the "presumption against extraterritoriality" instructs that "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *RJR Nabisco*, 136 S. Ct. at 2100.

In its 2016 ruling in *RJR Nabisco*, the Supreme Court drew on its precedent to describe a "two-step framework for analyzing extraterritoriality issues." *See id.* at 2101 (citing *Kiobel*, 569 U.S. 108; *Morrison v. Nat'l Austr. Bank Ltd.*, 561 U.S. 247 (2010)). The first step of the *RJR Nabisco* framework asks "whether the statute gives a clear,

17

affirmative indication that it applies extraterritorially," and thereby rebuts the presumption against extraterritoriality. *Id.* In making that determination, courts look to the text of the statute, but "an express statement of extraterritoriality is not essential." *Id.* at 2102. The structure and history of the statute are also relevant to this analysis, and in some circumstances the statute's "context" may be "dispositive." *Id.* at 2102-03.

If the first step reveals that a statute — or a specific statutory provision — has extraterritorial effect, our analysis is complete. *See id.* at 2101. If, on the other hand, the first step shows that a statute does not apply extraterritorially, a court must proceed to the second step identified in *RJR Nabisco*. Specifically, the court must then "determine whether the case involves a domestic application of the statute" by considering the challenged conduct in light of the statute's "focus." *Id.* at 2101. If "the conduct relevant to the statute's focus" occurred "in U.S. Territory," then the application of the statute is not truly extraterritorial. *See id.*[6] That is, such conduct would represent a "permissible *domestic* application" of the statute at issue. *See id.* at 2100.

---

[6] In delineating the two-step framework in *RJR Nabisco*, the Supreme Court drew on two of its key precedents addressing extraterritoriality: *Morrison* and *Kiobel*. The second step described in *RJR Nabisco*, however, appears to privilege consideration of a statute's "focus" — the approach set out in *Morrison* — over the inquiry articulated in *Kiobel*, which asked whether the claims at issue "touch and concern the territory of the United States." *See RJR Nabisco*, 136 S. Ct. at 2102; *Kiobel*, 569 U.S. at 124-25. On the other hand, *RJR Nabisco* did not overturn *Kiobel* and — in step two — retains a similar emphasis on the relevant claim's connection to U.S. territory. *See RJR Nabisco*, 136 S. Ct. at 2101. We need not resolve the effect of *RJR Nabisco* on *Kiobel* because, as explained herein, we do not reach the second step of the *RJR Nabisco* framework.

2.

The first step of the *RJR Nabisco* framework requires us to assess the specific statutory provisions at issue to determine whether those provisions demonstrate "clearly expressed congressional intent" that they will apply extraterritorially. *See* 136 S. Ct. at 2100, 2102; *see also Morrison*, 561 U.S. at 265 (emphasizing that "when a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms"). Here, Roe sued Linda pursuant to the civil remedy provision of the TVPA, codified at 18 U.S.C. § 1595. Section 1595 permits victims of the trafficking offenses specified in chapter 77 of Title 18 to sue the perpetrator of such an offense. Roe sought to recover damages based on Linda's violations of the trafficking offenses codified at 18 U.S.C. §§ 1589, 1590, and 1591, which prohibit forced labor, trafficking in forced labor, and forced sex trafficking, respectively. Roe also alleged that Linda conspired to commit those offenses in violation of § 1594. As described above, the jury at Linda's trial found that she had committed each of those four offenses and awarded Roe damages under § 1595.

Applying the first step of the *RJR Nabisco* inquiry, we are satisfied that § 1595 of the TVPA evinces a "clear indication of extraterritorial effect," at least with respect to the conduct at issue here. *See* 136 S. Ct. at 2102. Of crucial importance, § 1595 directly incorporates predicate offenses that govern foreign conduct, providing strong textual evidence of its extraterritorial effect when applied to those predicates. *See id.* at 2102-03. Additionally, the purpose, structure, history, and context of the TVPA militate toward the extraterritorial application of § 1595, to the extent that the relevant predicate offenses

19

reach the challenged foreign conduct at issue. *See id*. at 2102 (consulting "context" to determine extraterritoriality); *In re French*, 440 F.3d 145, 151 (4th Cir. 2006) (explaining that courts should consult "all available evidence," including text, statutory scheme, and legislative history to determine extraterritorial effect of statute).

We begin our analysis by looking to the Supreme Court's application of the first *RJR Nabisco* step to the circumstances of that case. In *RJR Nabisco*, the Court addressed whether the Racketeer Influenced and Corrupt Organizations Act ("RICO") applied extraterritorially. *See* 136 S. Ct. at 2099. The central RICO provision, 18 U.S.C. § 1962, contains four substantive prohibitions that criminalize certain means of influencing or operating an enterprise through "a pattern of racketeering activity." *See id*. at 2097 (citing 18 U.S.C. § 1962(a)-(d)). RICO defines "racketeering activity" as comprising a range of state and federal offenses, referred to as predicate offenses. *See id*. at 2096 (citing 18 U.S.C. § 1961). To determine whether the substantive RICO provisions applied to foreign conduct, the Court examined the text and context of § 1962. *See id*. at 2101-03.

The Court explained that "[t]he most obvious textual clue" that § 1962 applied extraterritorially was that RICO defined "racketeering activity" to include "a number of predicates that plainly apply to at least some foreign conduct." *See id*. at 2101. The Court reasoned that "Congress's incorporation of [such] extraterritorial predicates into RICO gives a clear, affirmative indication that § 1962 applies to foreign racketeering activity — but only to the extent that the predicates alleged in a particular case themselves apply extraterritorially." *See id*. at 2102. Thus, although Congress had not

20

included "an express statement of extraterritoriality" in RICO's text, the context and structure of § 1962 — specifically, its incorporation of "predicate statutes that *do* apply extraterritorially" — nonetheless provided the necessary "clear, affirmative indication" that § 1962 applied extraterritorially. *See id*. at 2101, 2102-03.

Put simply, *RJR Nabisco* teaches that, even absent an express statement of extraterritoriality, a statute may apply to foreign conduct insofar as it clearly and directly incorporates a predicate statutory provision that applies extraterritorially. *See* 136 S. Ct. at 2102-03. Applying this rule to the TVPA, we are satisfied that § 1595 reflects congressional intent that it applies extraterritorially to the extent that a plaintiff seeks redress for a predicate offense "that is itself extraterritorial." *See id*. at 2103.

Like § 1962, the TVPA's civil remedy provision directly incorporates a set of predicate offenses "that plainly apply to at least some foreign conduct." *See RJR Nabisco*, 136 S. Ct. at 2101. More specifically, § 1595 permits "a victim of a violation of this chapter [chapter 77 of Title 18]" to bring "a civil action against the perpetrator." *See* 18 U.S.C. § 1595. Many of the predicate offenses proscribed by chapter 77 apply extraterritorially, either expressly or by way of other provisions delineating their extraterritorial application. *See, e.g.*, 18 U.S.C. § 1585 (prohibiting, inter alia, seizure of persons "on any foreign shore" with "intent to make that person a slave"). Thus, pursuant to *RJR Nabisco*, "Congress's incorporation" of such "extraterritorial predicates" into § 1595 "gives a clear, affirmative indication" that § 1595 provides a civil remedy for the foreign conduct that is prohibited by chapter 77. *See* 136 S. Ct. at 2102. That is,

21

§ 1595 applies extraterritorially to the extent that the particular predicate offense supporting a specific claim applies extraterritorially. *See id*. at 2103.

Reinforcing that conclusion, the purpose, structure, history, and context of the TVPA all support the extraterritorial application of § 1595 for an appropriate predicate offense. The TVPA's stated purpose and accompanying congressional findings demonstrate that Congress enacted it to address the problem of human trafficking "throughout the world." *See* Pub. L. 106-386 §§ 101-102, 114 Stat. 1464, 1466-69 (2000). The TVPA contains numerous provisions authorizing funds and programs to support international efforts to address that global problem. *See, e.g.*, 22 U.S.C. § 7104(c) (creating "border interdiction" programs to combat trafficking at "key border crossings"); § 7105 (authorizing foreign assistance programs to protect and aid trafficking victims abroad). Notably, Congress has consistently amended the TVPA to reach and proscribe additional categories of foreign conduct. *See, e.g.*, 18 U.S.C. § 1591 (amended by 2003 TVPRA to cover conduct committed in special maritime and territorial jurisdiction of United States); § 3271 (enacted as part of 2006 TVPRA amendments to cover trafficking offenses by U.S. government employees abroad). Viewed as a whole, the TVPA represents a far-reaching congressional effort to combat transnational human trafficking on numerous fronts, including by expanding the civil claims and remedies available to its victims.

This is, in short, a situation in which Congress was clearly concerned with international rather than purely domestic matters. In these circumstances, unduly limiting the TVPA's scope risks frustrating its animating purpose. *See Ayesh*, 702 F.3d at 166

22

(ruling that federal statute prohibiting U.S. employees from pilfering public funds applied extraterritorially because holding otherwise would immunize broad category of conduct and frustrate congressional intent); *United States v. Delgado-Garcia*, 374 F.3d 1337, 1345 (D.C. Cir. 2004) (concluding that statutes prohibiting inducement of aliens to enter United States illegally applied extraterritorially because, inter alia, they were "fundamentally international" in "focus and effect").

Although we are satisfied that *RJR Nabisco* compels the extraterritorial application of § 1595 with respect to its extraterritorial predicates, we recognize that Part IV of that decision declined to apply RICO's civil cause of action to foreign conduct. *See* 136 S. Ct. at 2106. But that part of Justice Alito's opinion for the Court depended on factors that do not apply to § 1595 of the TVPA. First, RICO's civil remedy provision, codified at 18 U.S.C. § 1964(c), does not directly incorporate any extraterritorial predicates. Indeed, it makes no reference to any extraterritorial provision whatsoever. Rather, civil liability under § 1964(c) is premised on § 1962 criminal liability, but — crucially — is not coextensive with § 1962 liability. Justice Alito emphasized that the text of § 1964(c) limited its application to certain types of injuries, and thereby created a gap between the reach of § 1964(c) civil liability and § 1962 criminal liability. *See id.* at 2106, 2108. Further, § 1964 contained no other indication that it should apply extraterritorially; that is, it lacked the kind of "foreign-oriented language" or reference to foreign activity that could sustain its extraterritorial application. *See id.* at 2108-10 & n.12.

None of the foregoing considerations apply to § 1595 of the TVPA. As explained above, § 1595 expressly and directly incorporates the TVPA's criminal predicates, many

23

of which manifestly apply to foreign conduct. *See RJR Nabisco*, 136 S. Ct. at 2102. In that regard, § 1595 of the TVPA resembles § 1962 of RICO rather than the circumscribed text of § 1964(c). *See id.* at 2109-10 (comparing and distinguishing § 1962 and § 1964); *acc. Pfizer, Inc. v. Gov't of India*, 434 U.S. 308, 313-14 (1978) (sustaining extraterritorial application of Clayton Act civil remedy due to, inter alia, its incorporation of definitions expressly addressing foreign entities). Moreover, the text of § 1595 shows that it applies coextensively with its predicate offenses, omitting any qualifying or modifying language, which further distinguishes it from § 1964(c). Notably, as discussed above, the TVPA is replete with the "foreign-oriented language" that Justice Alito found lacking in § 1964(c), including in the predicates underpinning Roe's claim. *See RJR Nabisco*, 136 S. Ct. at 2110 n.12. Indeed, the TVPA more clearly targets foreign conduct than any provision of RICO, as demonstrated by its international scope and Congress's repeated expansions of its extraterritorial reach. *See, e.g.*, 2005 TVPRA, 119 Stat. at 3562.

In short, § 1595 evinces the same relationship to its extraterritorial predicate offenses that RICO's substantive criminal provision does to its predicates, and is not subject to textual limitations like those found in RICO's private cause of action. Section 1595 therefore provides a civil remedy for conduct that comes within the extraterritorial predicates of the TVPA. Accordingly, we now turn to the question of whether the predicate offenses underlying Roe's civil suit applied to Linda's extraterritorial conduct in 2007.

The jury awarded Roe damages based on their findings that Linda had violated 18 U.S.C. §§ 1589, 1590, 1591, and 1594. Each of those offenses is a qualifying predicate offense for § 1595 civil liability, as they are all found within chapter 77 of Title 18 of the U.S. Code. *See* 18 U.S.C. § 1595 (authorizing civil suits by "a victim of a violation of this chapter [chapter 77]" against the perpetrator or "whoever knowingly benefits" from that violation). The remaining question for us today is whether those predicates applied extraterritorially and reached Linda's foreign conduct in 2007. *See RJR Nabisco*, 136 S. Ct. at 2102. We will therefore assess each predicate offense, mindful that "the inclusion of *some* extraterritorial predicates does not mean that *all* [statutory] predicates extend to foreign conduct." *See id*.

a.

Section 1591 — prohibiting sex trafficking — presents the simplest analysis. Since 2003, § 1591 has applied to conduct committed "within the special maritime and territorial jurisdiction of the United States." *See* 18 U.S.C. § 1591; 2003 TVPRA, 117 Stat. at 2879. Where an offense is committed by a United States national like Linda, Title 18 defines the "special maritime and territorial jurisdiction of the United States" to include the "premises of United States diplomatic, consular, military or other United States Government missions or entities in foreign States," including related residences, buildings, and land, that, "irrespective of ownership," are used "for purposes of those missions or entities." *See* 18 U.S.C. § 7(9). It is undisputed that Linda's part in Roe's abuse occurred entirely on U.S. embassy grounds and housing in Sana'a. Those premises

unquestionably fall within the "special maritime and territorial jurisdiction of the United States," as defined in Title 18. *See id.*; *see also United States v. Passaro*, 577 F.3d 207, 214 (4th Cir. 2009) (observing that American embassies are "plainly within § 7(9)'s scope"); *United States v. Erdos*, 474 F.2d 157, 160 (4th Cir. 1973) (ruling that embassies comprise part of "special territorial jurisdiction" of United States); H.R. Rep. No. 107-236, at 74 (2001) (agreeing with *Erdos* and explaining that "embassies and embassy housing of the United States in foreign states are included in the special maritime and territorial jurisdiction of the United States"). Thus, § 1591 expressly applied to Linda's conduct in Sana'a in 2007, and she is liable for her violation thereof under § 1595.

b.

Sections 1589 and 1590 of Title 18 — prohibiting forced labor and forced labor trafficking — do not directly refer to foreign conduct. But since 2006, those sections have applied to extraterritorial acts committed by United States employees like Linda. The 2005 TVPRA amended the TVPA by enacting 18 U.S.C. § 3271, which provides:

> Whoever, while employed by . . . the Federal Government outside the United States, engages in conduct outside the United States that would constitute an offense under chapter 77 [of Title 18] if the conduct had been engaged in within the United States or within the special maritime and territorial jurisdiction of the United States shall be punished as provided for that offense.

*See* 18 U.S.C. § 3271; *see also* 2005 TVPRA, § 103, 119 Stat. at 3562. Such language "manifests an unmistakable congressional intent to apply extraterritorially." *See RJR Nabisco*, 136 S. Ct. at 2102 (internal quotation marks omitted). If a plainer indication was needed, Congress included § 3271 in chapter 212A, titled "Extraterritorial

26

Jurisdiction Over Certain Trafficking in Persons Offenses." *See* 2005 TVPRA, 119 Stat. at 3562. By the TVPA's own terms, this extraterritorial application is limited in scope; that is, it applies only to persons employed abroad by the federal government. Linda, however, falls within that class of employees. Consequently, her actions in Sana'a were within the extraterritorial scope of § 1589 and § 1590 in 2007. The jury therefore properly found her liable for violating those provisions under § 1595.

c.

Turning to § 1594, however, our analysis differs. Regardless of § 1594's extraterritoriality, the conspiracy provision for which the jury found Linda liable had not been enacted by 2007. Rather, the conspiracy prohibitions contained in § 1594(b) and (c) were added as part of the 2008 TVPRA amendments. *See* 2008 TVPRA, § 222, 122 Stat. at 5070. That said, we need not resolve whether § 1594 applies retroactively in order to affirm the award of damages to Roe. If this Court is "reasonably certain" that the jury would have awarded the same amount of damages regardless of the "issues erroneously submitted to it," we are entitled to affirm the award. *See Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 314 (4th Cir. 2012). That rule holds particular force where, as here, the jury has completed a special verdict form addressing liability and damages. *See id.* at 313-14 (collecting and comparing cases). Because the jury indicated that it calculated Roe's damages at $1 million for each of the four TVPA violations, but awarded only $1 million total because those damages were duplicative, it is beyond reasonable debate that the jury would have awarded Roe $1 million in

27

compensatory damages for any one of Linda's violations, and for any combination thereof. *See* J.A. 115-17.

In sum, the facts established at trial show that Linda committed at least three predicate offenses that applied to her extraterritorial conduct toward Roe in 2007. Pursuant to the Supreme Court's decision in *RJR Nabisco*, § 1595 authorizes Linda's civil liability based on her commission of those offenses.[7] We are entitled to affirm the jury's award of damages because they were properly awarded pursuant to § 1595, and because any error with regard to the applicability of § 1594 did not affect that result.

Because step one of the *RJR Nabisco* framework demonstrates that § 1595 applied extraterritorially to Linda's conduct, we need not proceed to step two, which guides our analysis only where the pertinent statute does not apply extraterritorially. *See RJR Nabisco*, 136 S. Ct. at 2101. We thus have no occasion to determine whether, under step two, Linda's offenses involved "a domestic application" of the TVPA. *See id.* Accordingly, we reserve for another day the issue of whether conduct occurring entirely within U.S. embassy grounds and associated housing takes place "in U.S. territory." *See id.*; *see also Arabian Am. Oil Co.*, 499 U.S. at 248. We confine our analysis today to the text and context of § 1595, and affirm the jury's award of damages to Roe on that basis.

---

[7] Linda's argument against the extraterritorial application of § 1595 relies almost entirely on the Fifth Circuit's ruling in *Adhikari v. Kellogg Brown & Root, Inc.*, where that court determined that § 1595 failed to provide a remedy for the plaintiffs' extraterritorial TVPA claims. *See* 845 F.3d 184, 201-06 (5th Cir. 2017); *see also* Br. of Appellant 8-16. That decision, however, is readily distinguishable because the *Adhikari* plaintiffs did not allege a violation of 18 U.S.C. § 1591 and the defendants' conduct occurred before the enactment of § 3271. *See Adhikari*, 845 F.3d at 190, 200.

B.

Turning to Linda's second and final appellate contention, we must resolve whether the district court properly admitted Jane Doe's evidence concerning the sexual abuse she suffered while working as the Howards' housekeeper in 2008. Linda raises various objections to Doe's testimony: that it was impermissible character evidence barred by Federal Rule of Evidence 404(a); that it could not be admitted under Rule 415, which permits testimony of "similar acts" in sexual assault lawsuits; that it was unfairly prejudicial and thus barred by Rule 403; and that the portion of Doe's testimony relating to Russell's statements constituted inadmissible hearsay. Each assertion is without merit.

First, Doe's testimony was plainly admissible under Rule 404(b)'s exception to Rule 404(a)'s general prohibition of character evidence to prove an action in conformity therewith. Doe's testimony described Linda's efforts to recruit Doe to work as the Howards' housekeeper, and her knowledge and facilitation of Russell's repeated sexual assaults on Doe. Consistent with the permissible uses of character evidence under Rule 404(b), Doe's testimony constituted highly probative evidence regarding Linda's intentions in her interactions with Roe; the existence of a plan or pattern of behavior by the Howards toward their live-in housekeepers; and Linda's knowledge of Russell's abuse of their staff. Doe's testimony was therefore admissible under Rule 404(b)(2), which permits the introduction of evidence of "a crime, wrong, or other act" to show, inter alia, intent, preparation, plan, knowledge, or absence of mistake. Indeed, the similarity between Doe and Roe's accounts of their abuse enhances the probative value and relevance of Doe's evidence. *See United States v. Queen*, 132 F.3d 991, 997 (4th

29

Cir. 1997).[8]  Because we are satisfied that Doe's testimony was properly admitted under Rule 404(b), we need not assess whether it was also admissible under Rule 415.

Nor was Doe's testimony barred by Rule 403.  Pursuant to Rule 403, a court may exclude evidence if its "probative value" is "substantially outweighed" by, inter alia, the risk of "unfair prejudice."  As noted above, Doe's testimony provided highly probative evidence of a pattern of abusive behavior by Russell, knowingly facilitated by Linda. Moreover, because the assaults Roe suffered occurred in Yemen nearly a decade prior to Linda's trial, Doe's evidence was particularly important given the lack of available physical evidence to corroborate Roe's claims.  Finally, the district court limited the scope of Doe's testimony to avoid revealing the upsetting details of Russell's past assaults, and thus reduced the risk of unfair prejudice.  *See United States v. Mark*, 943 F.2d 444, 449 (4th Cir. 1991).  In these circumstances, the court did not abuse its discretion in permitting Doe to testify.  *See Mohr*, 318 F.3d at 619-20 (emphasizing that Rule 403 only requires exclusion of evidence resulting in unfair prejudice that "*substantially*" outweighs its probative value); *United States v. Van Metre*, 150 F.3d 339, 351 (4th Cir. 1998) (sustaining admission of evidence of prior sexual assault in light of its "significant probative value" and trial court's effort to reduce its prejudicial impact).

---

[8] Linda argues that the standard for admitting evidence under Rule 404(b) changes when that evidence concerns "subsequent" (rather than prior) acts.  Br. of Appellant 26. No such rule exists in this Circuit.  Put simply, Rule 404(b) does not function differently merely because Doe's experience occurred after Roe's.  *See United States v. Mohr*, 318 F.3d 613, 617 (4th Cir. 2003).

Lastly, Doe's testimony concerning Russell's past statements was not inadmissible hearsay. Rule 804(b)(3) authorizes the admission of hearsay statements by an unavailable declarant that are manifestly against the declarant's interest. Specifically, the statement must be one that "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it . . . had so great a tendency . . . to expose the declarant to civil or criminal liability." Fed. R. Evid. 804(b)(3). Russell's statements to Doe — admitting to his past assaults of his former employees — more than qualify as statements against interest as so defined, and his death in 2012 establishes his unavailability to testify. Thus, the trial court did not abuse its discretion by relying on that exception to admit Doe's testimony regarding Russell's incriminating statements. *See, e.g.*, *United States v. Udeozor*, 515 F.3d 260, 267-68 (4th Cir. 2008) (evaluating flexible requirements of Rule 804(b)(3) and sustaining admission of hearsay statements that implicated declarant in multiple crimes).

In short, the district court did not abuse its discretion in admitting Doe's testimony, and we are satisfied to affirm the court's rulings in that regard.

IV.

Pursuant to the foregoing, we affirm the district court's judgment in favor of Roe and against Linda Howard.

*AFFIRMED*